INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, Petitioner,

v.

F. Ray MARSHALL, Respondent.

No. 76–1554.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1977.

Decided June 8, 1978.

As Amended Oct. 30, 1978.

John A. Fillion, Detroit, Mich., with whom Stephen I. Schlossberg, Washington, D. C., was on brief, for petitioner.

Anna K. Holmberg, Atty., Dept. of Labor, Washington, D. C., with whom Alfred G. Albert, Acting Sol., Donald S. Shire, Associate Sol. of Dept. of Labor, Washington, D. C., were on brief, for respondent.

Before LEVENTHAL, MacKINNON and WILKEY, Circuit Judges.

Opinion for the Court filed by LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

At issue in this case are determinations by the Secretary of Labor that certain members of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America [hereinafter UAW] are not entitled to worker adjustment assistance under the Trade Act of 1974, 19 U.S.C. §§ 2101–2487 (1976). Because we do not find sufficient detail in the record to ascertain the Secretary's rational basis for denying worker assistance, we remand to the Secretary for further consideration in light of this opinion.

## I. BACKGROUND

The Trade Act of 1974 was intended "to foster the economic growth of and full employment in the United States and to strengthen economic relations between the United States and foreign countries through open and nondiscriminatory world trade," while, at the same time, providing "adequate procedures to safeguard American industry and labor against unfair or injurious import competition, and to assist industries, firm[s], workers, and communities to adjust to changes in international trade flows."[1] Worker protection is provided principally through a scheme of worker adjustment assistance, by which a worker who is totally or partially separated because of import competition is generally guaranteed 70% of his average weekly wage during the period that he is out of work.[2]

On December 18, 1975, the UAW filed two petitions for worker adjustment assistance with the Department of Labor. One petition involved employees of the General Motors Corporation (GM), the Ford Motor Company and the Chrysler Corporation engaged in the production of standard (full-size) automobiles. The other petition covered GM and Ford workers involved in the production of subcompacts.

The Department of Labor assigned separate case numbers to each location covered by the petitions and held a hearing on all cases in Washington on January 26, 1976. The UAW participated in that hearing. On April 23, 1976, the Department of Labor issued its decision regarding GM's employees. The decision classified employees by plant groups, certifying some plant groups and denying relief to others.

On May 10, 1976, the decision regarding Ford workers issued. It also followed a pattern of selective relief on a plant by plant basis.

The UAW sought reconsideration of the denial of relief to four locations: GM's plants in South Gate, California, St. Louis, Missouri, and Wilmington, Delaware; and Ford's plant in Louisville, Kentucky. The UAW's petition for reconsideration was denied, and it then sought review in this court under § 250 of the Trade Act.[3]

Section 222 of the Trade Act of 1974 specifies those determinations that the Secretary must make before certifying a group as eligible for adjustment assistance: (1) that a significant number or proportion of workers in a firm or an appropriate subdivision of a firm have become totally or partially separated; (2) that sales or production of that subdivision have decreased absolutely; and (3) that "increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly" to the separations and the decline in sales or production.[4]

---

1. 19 U.S.C. § 2102(1), (4) (1976).

2. *Id.* § 2292.

3. *Id.* § 2322.

4. *Id.* § 2272:

   The Secretary shall certify a group of workers as eligible to apply for adjustment assistance under this part if he determines—

   (1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

   (2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

One determination pertinent to all plants in this case was whether there had been "increases of imports" of standards and subcompacts during the relevant period.[5] The Secretary found that the years 1974 and 1975 were not good ones for the car industry generally and the domestic car industry in particular. Retail sales of new cars in the United States declined 18.3% from Model Year (MY) 1973 to MY 1974 and declined 14.4% from MY 1974 to MY 1975.[6] Sales of domestically produced cars fell more rapidly: by 19.6% from MY 1973 to MY 1974 and by 20.4% from MY 1974 to MY 1975.

The tailspin in the domestic auto market followed the Arab oil boycott and the subsequent oil price increases and conservation measures that attended the "energy crisis." Understandably, full-size cars were hit harder than subcompacts in the declining market. Sales of full-size cars fell 39.6% from MY 1973 to MY 1974 and by 32.4% from MY 1974 to MY 1975. There was less impact on sales of imported full-size cars. From MY 1973 to MY 1974 the decline was in the range of 20%,[7] and in MY 1975 import sales of full-size cars rose dramatically, principally as a result of GM's shift of a significant part of its full-size car production to Canadian plants.

The decline in retail sales of subcompact cars was less than that of the automobile market as a whole. In MY 1974 sales of imported subcompacts dropped absolutely by 16.6% and relatively to 65.7% of the market. There was a slight absolute decline in import sales from MY 1974 to MY 1975, but the import share of the domestic market rose to 71.7%.

The Secretary also made findings regarding other classes of automobiles—the compact, luxury small, intermediate and luxury classes.[8] He concluded that domestic production of subcompact and full-size cars had been little affected by imports of autos outside their respective classes.[9]

The Secretary went on to consider whether there had been separations at the various plants, whether sales and production at those plants had decreased absolutely, and whether the data indicated that increases of imports of "like or directly competitive" cars "contributed importantly" to the separations.

The UAW objects to an essential premise that underlies the Secretary's entire analysis in these cases: that "an appropriate subdivision"—indeed, the largest possible "appropriate subdivision"—for purposes of 19 U.S.C. § 2272 (1976) is the individual plant. The UAW argues that such an in-

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

For purposes of paragraph (3), the term "contributed importantly" means a cause which is important but not necessarily more important than any other cause.

5. The "Notice of Determination" for workers at GM plants is published at 41 Fed.Reg. 18487 (1976). That for workers at the Ford plants appears at 41 Fed.Reg. 20042 (1976).

6. The general figures on the auto industry set out in this opinion are taken from the Notice of Determination for the GM Plants, 41 Fed.Reg. 18487 (1976). Other sources will be specifically identified as they are used. A "model year"

runs from September of one year through August of the next.

7. Sales of imported full-size cars decreased from 26 thousand units (0.7% of the market) in MY 1973 to 21 thousand units (0.9% of the market) in MY 1974.

8. In contrast to subcompacts and full size cars, the share of the domestic market held by domestic producers of luxury small cars increased steadily from MY 1973 to MY 1975. Sales of imported intermediate cars declined roughly 25% over this same period. Sales of imported compact cars increased 8.7% from MY 1973 to MY 1974 and then decreased 58.2% from MY 1974 to MY 1975. Luxury car imports showed only a small increase (7,000 units) from MY 1974 to MY 1975.

9. Notice of determination for the GM plants, 41 Fed.Reg. at 18488.

terpretation is not mandated by the Act and has not been justified by the Department of Labor. It maintains that other subdivisions—such as all the manufacturer's plants involved in the production of an affected car model—are equally appropriate if not preferable subdivisions.

The findings of the Office of Trade Adjustment Assistance regarding the specific plants involved in this appeal were as follows: [10]

#### A. *South Gate, California, Assembly Plant*

GM's South Gate plant produced only standard cars in MY 1974. For the first part of MY 1975 it produced the subcompacts Vega and Astre. During January and February of 1975 the plant was shut down to convert to "luxury small" car production; from March to December 1975 the plant produced the luxury small Monza, Skyhawk, Starfire and Sunbird.

As regards total or partial separations, the Secretary found that total hourly employment increased from MY 1974 to MY 1975 by 29% and declined 29.3% for the first three months of MY 1976. The increased employment in MY 1975 was concentrated in the last six months.

The Secretary then looked for declines in sales and production. He concluded that "[b]ecause of the brief periods during which the South Gate plant produced subcompact and luxury small cars, it is impossible to find that production of such cars decreased." [11] That is, because there was no history of subcompact or luxury small car production, the Secretary concluded that it was impossible for the group of workers at South Gate to meet the "decline in sales or production" criterion.

The UAW's appeal to this court challenged the treatment of subcompacts and luxury small cars as distinct submarkets and not "like or directly competitive" as that phrase is used in 19 U.S.C. § 2272

(1976). Prior to oral argument in this case, the Secretary of Labor agreed to reconsider the eligibility of the workers at the South Gate plant. For purposes of this reconsideration the Secretary treated the Monza as a subcompact. The end result was a determination that workers at South Gate who had been totally or partially separated between November 18, 1974, and October 1, 1975, are eligible for adjustment assistance. [12] We therefore find no issue in controversy regarding the South Gate plant and dismiss that part of the appeal as moot.

#### B. *Wilmington, Delaware, Assembly Plant*

GM's assembly plant in Wilmington, Delaware, produced full-sized Buicks and Chevrolets until June 1975, when it converted to production of subcompacts. Average hourly employment engaged in the production of full-size cars declined 15.3% from MY 1974 to MY 1975, and production of all full-size cars declined 11% for the same period. But during this period production of full-size Chevrolets increased 44%.

The Secretary found that increased imports only affected Chevrolet production in the United States. This impact was the direct product of GM's decision to shift some Chevrolet production from the United States to Canada. Certain domestic plants were closed and production consolidated in the remaining plants. As a result of this consolidation, Chevrolet production increased at the Wilmington facility from MY 1974 to MY 1975.

The Secretary therefore concluded that increased imports had not "contributed importantly" to the separations at the Wilmington plant. Those separations were attributed to decreased production of Buicks, for which there were no "like or directly competitive" imports. As such, no worker adjustment assistance was authorized. The UAW claims that the Chevrolet workers at Wilmington are qualified for worker adjustment assistance because Chevrolet produc-

---

**10.** The Office of Trade Adjustment Assistance is responsible for investigating worker adjustment assistance petitions. 29 C.F.R. § 90.12 (1977).

**11.** 41 Fed.Reg. at 18487.

**12.** 43 Fed.Reg. 1553 (1978).

tion nationally was down in MY 1975 as compared to MY 1974.

### C. *St. Louis, Missouri, Assembly Plant*

The UAW presses a similar contention with respect to GM's St. Louis plant. Notwithstanding the overall decline in domestic production of full-size Chevrolets, unit production of full-size Chevrolets increased at the St. Louis plant over the period for which the UAW wishes to obtain certification. The increase was due to rearrangement of domestic production, including consolidation in fewer plants. Nevertheless, there were apparently some totally or partially separated employees at the St. Louis plant during this period, and the Union argues that they should receive worker adjustment assistance as a product of the national decline in production.

### D. *The Louisville, Kentucky, Assembly Plant*

The Ford Motor Company plant in Louisville, Kentucky, produced full-size Fords. Model Years 1974 and 1975 were years of increased importation of Fords from Canada. But production of full-size Fords at the Louisville assembly plant actually increased by 13.8% from MY 1974 to MY 1975, and the average number of employees engaged in the production of full-size Fords increased 25% over the same period. The increased production at the Louisville plant was the product of consolidation. Since there was increased production of the import affected model, the Secretary concluded that increased imports did not contribute importantly to the total or partial separa-

tions of workers at the Louisville plant. Worker adjustment assistance was denied.[13] The UAW claims that such benefits were due those workers who sustained total or partial separation because domestic production of full-size Fords declined during MY 1974 and MY 1975 while imports increased.

### II. THE MEANING OF "AN APPROPRIATE SUBDIVISION" UNDER 19 U.S.C. § 2272

### A. *The UAW's Contentions*

The UAW sounds a number of different themes in its attack on the Secretary's use of the plant as "an appropriate subdivision." Initially, it points to the language of § 2272(1), (3)—specifically, the use of "an" rather than "the" before the phrase "appropriate subdivision." It argues that the use of "an" was intended to convey that a number of subdivisions are possible and that the one chosen need not be the most appropriate.[14] The underlying premise of this argument is that where the subdivision chosen by the union petitioning for adjustment assistance enjoys facial validity, a burden rests on the Secretary to show why that subdivision is "inappropriate."

The UAW points out that no such showing has been made. It maintains that the Secretary nowhere sets forth the logic behind the choice of the plant as the appropriate subdivision in this case, that the Secretary has apparently taken the position that an appropriate subdivision can never be larger than a plant,[15] and has done so without proffering any justification for this ironclad rule.

---

**13.** 41 Fed.Reg. 20042 (1976).

**14.** The UAW posits that a number of different subdivisions could have been chosen in the instant case:

    (1) all domestic manufacturers in the subcompact and full-size categories respectively;

    (2) the subcompact and full-size operations of one manufacturer;

    (3) all the plants of the manufacturer involved in the production of the trade-impacted model;

    (4) each separate plant producing a trade-impacted model;

    (5) each shift or department within a plant affected by the decline in sales of the trade-impacted model.

Brief of Petitioner at 8.

**15.** This appears to be the thrust of the briefs filed in this court by the Secretary. During oral argument counsel for the Secretary conceded that this interpretation is correct. For a case where a court found the Secretary's use of a subdivision smaller than a plant proper, see *Paden v. United States Dept. of Labor*, 562 F.2d 470, 475 (7th Cir. 1977).

An interwoven contention is that the Secretary's determination as to the appropriate subdivision is inconsistent with the Congressional intent to liberalize the availability of adjustment assistance. The union maintains that Congress envisioned a less rigid definition of "an appropriate subdivision."

## B. Analysis

The Trade Act of 1974 gave the President broad authority to negotiate favorable trade agreements. The overall purpose was to reduce or eliminate tariff and nontariff barriers to international trade and thus realize the economic and political benefits of a trade-linked world.[16] Congress realized that benefits and burdens of a liberalized international trade policy would not be distributed uniformly throughout the country. Some benefits are general and national, such as lower prices and expansion of more efficient industries. But liberalized trade has fairly predictable costs, costs that often have isolated impacts. One is decline of employment in those domestic industries that are less efficient than their foreign competitors. Domestic industries may also fall prey to subsidies, exchange-rate advantages, and lower wage rates enjoyed by foreign industries. Overall, liberalized international trade may lead, in trade negotiations, to the imposition of burdens on some domestic industries in order to garner benefits for other industries and advance the commonweal.

Congress was of the view that fairness demanded some mechanism whereby the national public, which realizes an overall gain through trade readjustments, can compensate the particular industries and workers who suffer a loss—much as the doctrine of eminent domain requires compensation when private property is taken for public use. Otherwise the costs of a federal policy that conferred benefits on the nation as a whole would be imposed on a minority of American workers and industries.[17]

A primary purpose of the Trade Act of 1974 was to make worker adjustment assistance more readily available than it had been under the Trade Expansion Act of 1962.[18] For the first seven years of the earlier program, no workers were found eligible for the program's benefits.[19] Congress hoped to overcome this inertia with the "eased qualifying criteria and . . . streamlined petitioning process" included in the Trade Act of 1974.[20] There is no particular legislative history suggesting that Congress intended to achieve this objective through an elastic concept of "an appropriate subdivision." The legislative history that does exist focuses on attaining liberalization through elimination of the Trade Expansion Act's requirements that the petitioner show (1) a causal link between increased imports and trade agreement concessions, and (2) that increased imports are a "major cause" of separations.[21] In place of the latter requirement, the Trade Act of 1974 mandates that increased imports be

16. 19 U.S.C. § 2102 (1976). See generally S.Rep.No.93–1298, 93d Cong., 2d Sess. 5–19 (1974), reprinted in [1974] U.S.Code Cong. & Admin.News, pp. 7186, 7187–7200; H.R.Rep. No.93–571, 93d Cong., 1st Sess. 3–4 (1973).

17. See, e. g., 120 Cong.Rec. 39854 (1974) (Sen. Nelson) ("Out of equity and fairness, Congress must therefore design a program to adequately protect those workers from the dislocations generated by expanded trade."). See also Trade Reform: Hearings on H.R. 6767 Before the House Comm. on Ways and Means, 93d Cong., 1st Sess., pt. 1, at 181–82 (1973) (statement of Peter M. Flanigan, Executive Director, Council on International Economic Policy); id. pt. 2, at 353–54 (statement of Ambassador Wil-

liam Eberle, United States Special Representative for Trade Negotiations).

18. Pub.L.No.87–794, 76 Stat. 872.

19. S.Rep.No.93–1298, 93d Cong., 2d Sess. 131 (1974), reprinted in [1974] U.S.Code Cong. & Admin.News, pp. 7186, 7273.

20. Id.

21. Trade Expansion Act of 1962, Pub.L.No.87–794, § 301(c), 76 Stat. 884; see S.Rep.No.93–1298, 93d Cong., 2d Sess. 133 (1974), reprinted in [1974] U.S.Code Cong. & Admin.News, pp. 7186, 7275; H.R.Rep.No.93–571, 93d Cong., 1st Sess. 53 (1973).

shown to have "contributed importantly" to separations.[22]

The absence of specific legislative history on the meaning of "an appropriate subdivision" does not mean the Secretary's interpretation of that phrase is to be shaped without reference to the general remedial purpose of the worker adjustment assistance provisions. We can profitably apply the comment of the Supreme Court, per Justice Frankfurter, in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487, 71 S.Ct. 456, 463, 95 L.Ed. 456 (1951):

> It is fair to say that in all this Congress expressed a mood. And it expressed its mood not merely by oratory but by legislation. As legislation that mood must be respected, even though it can only serve as a standard for judgment and not as a body of rigid rules assuring sameness of application. Enforcement of such broad standards implies subtlety of mind and solidity of judgment.

▇ Justice Frankfurter's comment, made with respect to judicial interpretations of legislation, applies with full vigor to administrators of federal programs. Born of "mood" considerations is the doctrine that remedial statutes are to be liberally construed.[23] It follows, as a reasonable corollary, that when a petitioner under a government benefits program puts forward an interpretation of a legislative provision that is arguably consonant with the statutory language, he is at least entitled to a reasoned statement why the administrator will not adopt that interpretation.

▇ In briefs and oral argument, the Secretary has maintained in the instant case that the Trade Act of 1974 places selection of "an appropriate subdivision" within the discretion of the Secretary. As far as it goes, this statement is unexceptionable. But the Secretary further argues that the plant is the largest subdivision that permits him to differentiate those separations resulting from increased imports from those separations that do not. We do not speculate on the plausibility of this contention[24] or critique the post-hoc rationalizations of the Department of Labor's counsel.[25] It is decisive on this appeal that the Secretary's choice of the plant as to the appropriate subdivision is not the product of a reasoned analysis evident in the administrative record.[26]

The only attempt at analysis occurs in the Secretary's statement denying the motion

---

**22.** 19 U.S.C. § 2272(3) (1976). The meaning of "contributed importantly" is a central concern of another case decided today, *United Glass & Ceramic Workers v. Marshall*, 189 U.S.App. D.C. ——, 584 F.2d 398 (D.C.Cir. 1978).

**23.** *See, e. g., Peyton v. Rowe*, 391 U.S. 54, 65, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968); *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 353, 64 S.Ct. 120, 88 L.Ed. 88 (1943); *Piedmont & Northern Ry. v. ICC*, 286 U.S. 299, 311–12, 52 S.Ct. 541, 76 L.Ed. 1115 (1932).

**24.** *See SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

**25.** *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Burlington Truck Lines v. U. S.*, 371 U.S. 156, 168–69, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *Portland Cement Assn. v. Ruckelshaus*, 158 U.S.App.D.C. 308, 328, 486 F.2d 375, 395 (1973), *cert. denied*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

**26.** While the factual findings of the Secretary must be accepted if supported by "substantial evidence," 19 U.S.C. § 2322(b) (1976), there is a further requirement that the rulings made on the basis of those findings be in accordance with the statute and not be arbitrary or capricious, and for this purpose the law requires a showing of reasoned analysis. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Greater Boston Television Corp. v. FCC*, 143 U.S. App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). Compare the Seventh Circuit's observations in another worker adjustment assistance case, *Paden v. United States Dept. of Labor*, 562 F.2d 470, 473 (7th Cir. 1977) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)):

> The persuasiveness of the Secretary's interpretation "depend[s] on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade if lacking power to control."

for reconsideration. To defend his choice of the plant as "an appropriate subdivision", the Secretary relied on the definition of "appropriate subdivision" found in the regulations promulgated pursuant to the Trade Act.[27]

> "Appropriate subdivision" means an establishment in a multi-establishment firm which produces the domestic articles in question or a distinct part or section of an establishment (whether or not the firm has more than one establishment) where the articles are produced. The term "appropriate subdivision" includes auxiliary facilities operated in conjunction with (whether or not physically separate from) production facilities.[28]

The Secretary went on to argue, citing *Webster's New International Dictionary,* that an "establishment" can be at most a "separate identifiable physical facility."[29] Thus he reads the regulations to say the largest unit an "appropriate subdivision" can be is a plant.

The definition of "establishment" is not as clear as the Secretary suggests.[30] More importantly, in interpretation of federal statutes and Congressional intent, this kind of semantic exegesis is not conclusive. Nowhere in the administrative record does the Secretary indicate—as a matter of fact or law—why the "appropriate subdivision" put forward by the UAW is inappropriate, and why, in this case, the choice of the plant as the appropriate subdivision is the only proper course under the Trade Act. We do not say the Secretary was bound to adopt the Union's approach, but he is bound to elucidate the reasoned course that led him elsewhere.

Both the UAW and the Secretary have been vague on the actual implications of a choice of a subdivision other than the plant. Perhaps the Secretary's mechanical adoption of the plant as "an appropriate subdivision" has forestalled a dialogue between the UAW and the Secretary. On remand the Secretary might require UAW to provide greater specificity, perhaps to make clear which workers were separated because of imports yet were made ineligible by the plant limitation on the definition of "an appropriate subdivision." We can discern the possibility hypothetically,[31] but we do not pursue the matter. It is not our function to undertake a full appraisal of the UAW's position. In general we perceive that the larger the subdivision the greater the risk that assistance will be given to workers whose separations are not the product of increased import competition. Contrariwise, the smaller the subdivision the greater the risk that deserving workers will be found ineligible. It is the Secretary's function to choose a subdivision that best effectuates the purposes of the Trade Act in light of the circumstances of the individual case. The reasons for his choice must be evident in the record.

We remand to the Secretary for a clarification of the reasons underlying the determination of "an appropriate subdivision." Even if a more detailed inquiry does not

---

27. Appendix for Petitioner at 318–24.

28. 29 C.F.R. § 90.2 (1977).

29. *Appendix for Petitioner* at 321.

30. It appears that one definition of establishment in *Webster's Third New International Dictionary* is "a permanent organization," and would encompass any subdivision up to the *size of the entire corporation. Webster's Third New International Dictionary 778 (1965).*

31. To take one possible scenario: In MY 1974 Plant A produces subcompacts and Plant B produces full-size cars. Employment levels at the two plants are identical. During the model year there is an increase in the importation of full-size cars. For any of a number of reasons

the manufacturer decides to convert Plant A to full-size production for MY 1975 and Plant B is now to produce subcompacts. As the result of increased import competition, workers at Plant A are laid off. If the plant is the appropriate subdivision, our understanding is that none of the workers will be certified for worker adjustment assistance because at neither of the plants did an "increase of imports of articles like or directly competitive with articles produced by [the plants] contribute[] importantly to such total or partial separation." At Plant A there is no history of full-size production and therefore none of the workers qualify for assistance, *i. e.,* petitioners cannot show an import-induced decline in production.

change the result in this case, the class of those seeking or considering adjustment assistance will be afforded (1) a description of the circumstances that the Secretary believes mandate the choice of the plant as the appropriate subdivision and (2) an explanation why he holds that opinion. We remand the case as a whole, rather than the record, to make it clear that the Secretary's latitude on remand extends to the full scope of his function under the Act. It is within his discretion to make a new determination, with new findings and reasons.

*So ordered.*