**UNITED STEELWORKERS OF AMERICA and Its Locals 68, 7508, and 196, Plaintiffs,**

v.

**Raymond J. DONOVAN, Secretary of Labor, Defendant.**

**Court No. 83–7–00944.**

United States Court of International Trade.

March 12, 1986.

---

Bredhoff & Kaiser (James D. Holzhauer, Washington, D.C., on motion), for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch (Sheila N. Ziff, Washington, D.C., on motion), for defendant.

## ON PLAINTIFFS' MOTION FOR REVIEW OF ADMINISTRATIVE DETERMINATION UPON AGENCY RECORD

RE, Chief Judge:

In this action, plaintiffs, on behalf of former employees of the Duval Corporation, seek review of a final determination by the Secretary of Labor which denied certification of eligibility for benefits under the worker adjustment assistance program of the Trade Act of 1974, tit. II, §§ 221–249, 284, 19 U.S.C. §§ 2271–2321, 2395 (1982 & Supp. I 1983). Specifically, the Secretary found that the workers were not eligible for assistance because increases of imports did not contribute importantly to their separation from employment.

After reviewing the administrative record and the arguments of the parties, the Court holds that the determination of the Secretary is not supported by substantial evidence, and is not in accordance with law. Therefore, the case is remanded to the Secretary for further consideration not inconsistent with this opinion.

On July 6, 1982, July 28, 1982, and August 5, 1982, plaintiffs, on behalf of employees at three mining operations of Duval Corporation, filed petitions for certification of eligibility to apply for trade adjust-

ment assistance benefits. Pursuant to section 221(a) of the Trade Act of 1974, 19 U.S.C. § 2271(a), the Office of Trade Adjustment Assistance (OTAA) of the Department of Labor [1] published notices in the *Federal Register* stating that it had received the petitions and had instituted an investigation into their validity. 47 Fed. Reg. 31,450, 36,484 (1982).

Section 222 of the Trade Act requires the Secretary to certify a group of workers as eligible to apply for trade adjustment assistance benefits if it is determined:

(1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

Trade Act of 1974 § 222, 19 U.S.C. § 2272 (Supp. I 1983).

Plaintiffs contend that increased imports of copper contributed importantly to the decline of sales and production by Duval Corporation, and to the workers' separation from employment. The Secretary denied plaintiffs' petition on the grounds that it failed to satisfy the increased imports requirement of section 222. 19 U.S.C. § 2272(3).

*The Secretary of Labor's Determination*

The OTAA's investigation disclosed that Duval Corporation, a wholly owned subsidiary of Pennzoil Company, owns three mines in Arizona, which are known as Mineral Park, Sierrita, and Esperanza. On December 15, 1981, all three operations ceased production, and approximately 2,000

workers were separated from employment. Some workers were retained at each site and, on April 1, 1982, the Sierrita Mine resumed production at 40 percent of capacity.

The workers at all three mines were found to be engaged in both the mining of copper ore and the production of copper concentrate. Copper ore, concentrate, precipitate, and matte, are types of copper which are smelted or converted into blister copper. The record shows that statistics for the domestic production of copper ore, concentrate, precipitate, and matte are grouped under the heading "copper ore." Statistics are also provided for the later stages of processing, under the headings blister copper and refined copper. Most blister copper is cast into copper anodes for electrolytic refining. Refined copper is cast into wirebar, ingot, or other shapes for later fabrication. Duval processed between 20 and 25 percent of its copper concentrate into blister copper. All of the blister copper and the remainder of the copper concentrate produced by Duval was refined by outside companies on a toll basis.

The OTAA performed a trade and industry analysis to ascertain the effect of imports on the domestic copper industry. The investigation disclosed that imports of copper ore in 1980 increased 70.6 percent over 1979. In 1981, imports of copper ore decreased 20.6 percent to a level representing 2.7 percent of domestic production. During the first three quarters of 1982, imports of copper ore increased 338.5 percent. Imports of blister copper decreased 70.3 percent in 1979, from a 5-year high attained in 1978. In 1980, however, imports rose 88.8 percent. Imports of blister copper decreased in 1981 by 35.5 percent, and increased by 229.2 percent in 1982. The investigation also disclosed that imports of refined copper increased 107 percent in 1980 from 1979. Imports of refined copper declined by 21.8 percent in 1981 and

---

**1.** The Director of the Office of Trade Adjustment Assistance has been delegated the responsibility for investigating adjustment assistance eligibility. 29 C.F.R. § 90.2 (1985).

23.7 percent in 1982. The Secretary noted that an industry-wide strike of mine workers affected the total level of copper imports in 1980.

Based on these findings, the Secretary concluded that the workers should be denied certification because, "U.S. imports of refined copper declined both absolutely and relative to domestic production in 1981 compared to 1980 and in the January through September 1982 period compared to the same period in 1981." *See* 48 Fed. Reg. 12,006 (1983).

Thereafter, plaintiffs applied for reconsideration of the administrative determination. On April 25, 1983, the Secretary issued a notice of negative determination in response to plaintiffs' application. 48 Fed. Reg. 28,524 (1983). Subsequently, plaintiffs commenced this action seeking judicial review of the Secretary's final negative determination.

On April 30, 1984, the Court granted the Secretary's motion for a voluntary remand in order to allow the Secretary to supplement the record with a survey of Duval's customers. After reconsideration, on June 29, 1984, the Secretary issued a "further determination," which stated that the "[r]esults of the customer survey [confirmed] the Department's original determination that imports did not contribute importantly to ... worker separations at the Duval Corporation in 1982." Plaintiffs then requested this Court to set aside the Secretary's determination.

*Discussion*

Section 284 of the Trade Act of 1974 empowers the Court of International Trade to review a determination by the Secretary of Labor that denies certification of eligibility for adjustment assistance to assure that the determination is supported by substantial evidence and is in accordance with law. 19 U.S.C. § 2395(c); *see Woodrum v. Donovan*, 5 CIT 191, 193, 564 F.Supp. 826, 828 (1983), *aff'd*, 737 F.2d 1575 (Fed.Cir.1984). The findings of fact by the Secretary are conclusive if supported by substantial evidence. Trade Act of 1974 § 284(b), 19

U.S.C. § 2395(b) (1982). Moreover, "the rulings made on the basis of those findings [must] be in accordance with the statute and not be arbitrary or capricious, and for this purpose the law requires a showing of reasoned analysis." *International Union v. Marshall*, 584 F.2d 390, 396 n. 26 (D.C. Cir.1978), *quoted in ILWU Local 142 v. Donovan*, 9 CIT ——, Slip Op. 85–127, at 9 (Dec. 11, 1985); *see* 19 U.S.C. § 2273(c).

The plaintiffs urge that the Secretary's negative determination of eligibility should be set aside. First, they contend that the Secretary improperly used 1982 as a comparison year, because the workers were separated from employment in 1981, not 1982. Second, plaintiffs allege that it was improper for the Secretary to consider import statistics for the third quarter of 1982, a time period subsequent to the separation of the workers. Third, they maintain that the Secretary "erred as a matter of law in limiting his focus to refined copper," and that the Secretary should also have considered imports of copper ore and blister copper. The plaintiffs also contend, for the same reasons, that the customer survey conducted by the Secretary did not accurately reflect the effect of imports on Duval's sales.

█ It is well established that, in the absence of a valid reason to consider a different time period, the Secretary determines whether there has been an increase of imports by a comparison of the year of separation with the immediate preceding year. *See, e.g., Paden v. United States Dep't of Labor*, 562 F.2d 470, 473 (7th Cir.1977); *Katunich v. Donovan*, 8 CIT 157, 594 F.Supp. 744, 752 (1984). In this case, the Secretary found that there were "major layoffs" in both 1981 and 1982, and, therefore, 1982 was a base year for comparison. Plaintiffs contend that, since a significant number of workers were separated from employment in 1981, by using 1982 as a base year, the Secretary has considered an irrelevant and erroneous time period. Thus, the question presented in this case is whether the Secretary's finding that 1982, in addition to 1981, is a year

of separation is supported by substantial evidence in the record, and is in accordance with law.

The Secretary found that, at all three mines, major layoffs occurred in December 1981 and March, May, June, and July 1982. Duval separated approximately 2,000 workers, over 68 percent of its total work force, when the mines ceased production in December 1981. This represented an 88 percent decline in the average number of workers employed at the Mineral Park mines, a 54 percent decline at the Sierrita mine, and an 83 percent decline at the Esperanza mine. Although additional separations occurred in 1982, the number of workers affected was significantly less than in 1981. Plaintiffs contend that since the significant majority of workers were separated from employment in 1981, the Secretary should not have considered whether imports increased in 1982.

The Secretary has promulgated regulations which provide definitions relating to trade adjustment petitions. These regulations provide, in part:

"Layoff" means a suspension from pay status for lack of work initiated by the employer and expected to last for no less than seven (7) consecutive calendar days.

. . . .

"Significant number or proportion of the workers" means that:

(a) In most cases the total or partial separations, or both, in a firm ... are the equivalent to a total unemployment of five percent (5 percent) of the workers or 50 workers, whichever is less. . . .

29 C.F.R. § 90.2 (1985).

Surely, the 2,000 workers who were separated in December 1981 and who filed for adjustment assistance constitute a "significant number or proportion of the workers," as that phrase is defined by the Secretary. See 29 C.F.R. § 90.2 (1985). However, the record shows that the workers separated in 1982 also constitute a significant number of workers. From the record, the Court can reasonably discern that the Secretary's determination was based on an analysis of both 1981 and 1982. The workers were

denied certification because the Secretary found that imports declined in both 1981 and 1982. On these facts the Court cannot say that the Secretary's choice "is not the product of a reasoned analysis evident in the administrative record." See *International Union v. Marshall*, 584 F.2d 390, 396 (D.C.Cir.1978). Hence, in view of the regulations promulgated by the Secretary, and the evidence contained in the record, the Court holds that the Secretary's decision to use 1982 as a base year is supported by substantial evidence in the record, and is in accordance with law.

Plaintiffs also contend that the Secretary should not have considered import statistics for the third quarter of 1982. Plaintiffs claim that this data is irrelevant to their petition because it relates to a time period subsequent to the workers' separation from employment. In addition, plaintiffs contend that the Secretary's reliance on these statistics is inconsistent with his certification of similarly situated mine workers at Kennecott Minerals Company, who were also represented by the United Steelworkers Union. The Secretary explained that the Duval workers were denied certification because data for the third quarter of 1982 became available, and the Kennecott investigation was based on data for the first 6 months of 1982. *See* 48 Fed.Reg. at 28,524. The Secretary did not explain, however, how the decline in imports *subsequent* to the Duval workers' separation was "likely to affect employment in the year of separation." *Paden*, 562 F.2d at 473. Hence, the Court holds that the case must be remanded so that the Secretary may articulate with reasonable clarity his reasons for considering imports after the separation of the workers. *See UAW v. Marshall*, 584 F.2d 390, 397 (D.C. Cir.1978); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C.Cir. 1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); *see also Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (court may require additional explanation of reasons for agency decision).

■ Plaintiffs also contend that the Secretary improperly restricted his focus to imports of refined copper. The Secretary, however, determined that "the proper focus of competitive impact" should be on refined copper, since that was the product most "like or directly competitive with" the articles produced by Duval.

In *United Shoe Workers v. Bedell*, 506 F.2d 174 (D.C.Cir.1974), the United States Court of Appeals for the District of Columbia Circuit held that component parts of an article are not "like" the imported articles which incorporate them. *Id.* at 177–78. The court also noted that the parties did not contend that the term "directly competitive" applied to the domestic manufacturer of component parts. *Id.* at 178 n. 13. Moreover, the *United Shoe Workers* court recognized that the terms "like" and "directly competitive" are not synonymous or explanatory of one another. *Id.* at 186 n. 77; *see* S.Rep. No. 1298, 93d Cong., 2d Sess. 121, *reprinted in* 1974 U.S.Code Cong. & Ad.News 7186, 7265. The court distinguished the term "like" from the term "directly competitive" by noting that "many products can be directly competitive without having identical or nearly identical physical characteristics." 506 F.2d at 185.

In the *United Shoe Workers* case, the court stated that Congress had "expressly redefined 'directly competitive' in the Trade Expansion Act to cover items that were in different stages of processing." 506 F.2d at 186; *see* Trade Expansion Act of 1962 § 405(4), 19 U.S.C. § 1806(4) (1970) (current version at 19 U.S.C. § 2481(5)). The legislative history of the Trade Act of 1974 indicates that the term "like or directly competitive" was used in the same context as in the Trade Expansion Act of 1962. S.Rep. No. 1298, 93d Cong., 2d Sess. 121, *reprinted in* 1974 U.S.Code Cong. & Ad. News 7186, 7265; *see Morristown Magnavox Former Employees v. Marshall*, 671 F.2d 194, 198 (6th Cir.), *cert. denied sub nom.* 459 U.S. 1041, 103 S.Ct. 458, 74 L.Ed.2d 610 (1982). The statutory definition of "directly competitive" provides:

(5) An imported article is "directly competitive with" a domestic article at an earlier or later stage of processing, and a domestic article is "directly competitive with" an imported article at an earlier or later stage of processing, if the importation of the article has an economic effect on producers of the domestic article comparable to the effect of importation of articles in the same stage of processing as the domestic article. For purposes of this paragraph, the unprocessed article is at an earlier stage of processing.

19 U.S.C. § 2481(5) (1982); *see* 29 C.F.R. § 90.2 (1985).

The legislative history to the Trade Expansion Act provides examples of the expanded definition of directly competitive:

Under this provision, an imported article may be considered "directly competitive with" a domestic article . . . if the one is at an earlier or later stage of processing than the other, or if one is a processed and the other an unprocessed form of the same article, and if the economic effect of importation of articles is in the same stage of processing as the domestic article.

The term "earlier or later stage of processing" contemplates that the article remains substantially the same during such stages of processing, and is not wholly transformed into a different article. Thus, for example, zinc oxide would be zinc ore in a later stage of processing since it can be processed directly from zinc ore. For the same reason, a raw cherry would be a glace cherry in an earlier stage of processing, and the same is true of a live lamb and dressed lamb meat. . . .

H.R.Rep. No. 1818, 87th Cong., 2d Sess. 24 (1962); *see United Shoe Workers*, 506 F.2d at 186 n. 80.

■ Thus, in the context of petitions filed by workers who mine ore, it is appropriate for the Secretary to consider the effects of imported ore or "the more refined imported product." *See* Bratt, *Issues in Worker Certification and Questions of Future Direction in the Trade Adjust-*

*ment Assistance Program*, 14 Law & Pol'y Int'l Bus. 819, 848 (1982). The cases cited by the defendant in support of the Secretary's determination are inapposite because they all involve component parts rather than articles in earlier or later stages of processing.

In this case, the Secretary limited his focus to imports of refined copper because "neither copper ore nor copper concentrate was marketed to outside customers." 48 Fed.Reg. 28,524 (1983). The statute, however, contemplates that imported articles which are not "like" the product produced by the domestic firm may nevertheless be "directly competitive with" domestic articles. Indeed, plaintiffs contend that there is "considerable cross-elasticity of demand between refined copper and other forms of copper." By focusing only on the product ultimately marketed by the workers' firm, the Secretary has, in effect, limited the scope of the statutorily defined words "directly competitive." Hence, the Court holds that the Secretary has improperly restricted his focus to articles marketed by Duval, rather than articles like or directly competitive with articles produced by Duval. Therefore, the Secretary's determination is not in accordance with law, and is vacated.

### Conclusion

In light of the facts contained in the administrative record, the statute, and relevant case law, it is the holding of the Court that the Secretary of Labor's denial of certification is not supported by substantial evidence, and is not in accordance with law.

Accordingly, the determination of the Secretary of Labor is vacated, and the case is remanded to the Secretary for a redetermination of the certification of eligibility for adjustment assistance. Since the Secretary may wish to take additional evidence on matters which relate to the workers' petition, the Court notes that "the Secretary's latitude on remand extends to the full scope of his function under the Act. It is within his discretion to make a new determination, with new findings and reasons." *International Union v. Marshall,* 584 F.2d 390, 396 (D.C.Cir.1978). Finally, it is ordered that the Secretary shall certify the record and report to the Court the results of the further proceedings within 60 days from the date of the entry of this opinion and order.