ORDERED that, in all other respects, the motion for injunctive relief is denied.

FORMER EMPLOYEES OF DELCO SYSTEMS OPERATIONS, CULPEPER, VIRGINIA, PLAINTIFFS v. UNITED STATES, DEFENDANT

Court No. 86–12–01545

(Decided November 5, 1987)

*Harry L. Dolan, pro se,* for plaintiffs.

*Richard K. Willard,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch (*Elizabeth C. Seastrum*), Civil Division, United States Department of Justice, for defendant.

MEMORANDUM OPINION AND ORDER

RESTANI, *Judge:* Plaintiffs bring this action pursuant to 19 U.S.C. § 2395 (1982) and 28 U.S.C. § 1581(i) (1982) protesting the final determination of the Secretary of Labor (Secretary) denying certification of eligibility to apply for trade adjustment assistance. *See* 51 Fed. Reg. 35439, 35442 (Oct. 3, 1986) (summary of negative determination regarding eligibility); 51 Fed. Reg. 37797 (Oct. 24, 1986) (negative determination regarding application for reconsideration).

BACKGROUND

Under the Trade Agreements Act of 1974, a group of workers who are totally or partially "separated" from their employment as a result of "increases in imports of articles like or directly competitive with the articles produced by such workers' firm or an appropriate subdivision thereof" may be certified by the Secretary as eligible to apply for adjustment assistance. 19 U.S.C. § 2272 (1982 & Supp. III 1985).

The Secretary made the following findings of facts, which, although they were not all supported by the record, do not appear to be challenged directly. The group of workers at issue were employed by Delco Systems Operations (Delco), a subsidiary of General Motors Corporation, at its Culpeper Virginia facility. Administrative Record (R) 36–38 (investigative report), R. 43–44 (negative determination regarding eligibility) and 51 Fed. Reg. at 37798 (negative determination regarding reconsideration). These workers produced gun turrets which were sold and shipped under contract to the General Motors Diesel Division (DDGM) in Canada. *Id.* The gun turrets were then mounted on light armored vehicles (LAV) and imported into the United States by the U.S. Government. *Id.* "The Culpeper facility closed in October 1985 and its work consolidated with that of DDGM's plant in London, Ontario." *Id.*

The Secretary found that this case involves lost export sales, and concluded that "[a]ny loss in export sales is not a basis for certification under the terms of the Trade Act of 1974," R. 44, which it subsequently refined to the proposition that "[l]ost export sales resulting from a shift of production to a foreign country is not a basis for certification under the terms of the Trade Act of 1974." 51 Fed. Reg. at 37798.

The Secretary also concluded, in his denial of reconsideration, that "the gun turrets produced at Culpeper are not like or directly competitive with the finished article—light armored vehicles produced in Canada." 51 Fed. Reg. at 37798. *See* 19 U.S.C. § 2272(3).[1] The Secretary supported this conclusion by stating that "imported finished articles are not like or directly competitive with domestic component parts thereof (*United Shoe Workers of America, AFL-CIO* v. *Bedell,* 506 F.2d 174 (D.C. Cir. 1974)). In that case the court held that imported finished women's shoes were not like or directly competitive with shoe counters, a component of footwear." 51 Fed. Reg. at 37798.

---

[1]Section 2272 provides, in part, that

> The Secretary shall certify a group of workers as eligible to apply for adjustment assistance under this part if he determines—
>
> * *  *  *  *  *  *
>
> (3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

19 U S.C § 2272(3).

Discussion

I. The Secretary's Determination That Gun Turrets Are Components of LAVs and Therefore Not Directly Competitive With Those Same Domestically Produced Gun Turrets.

Plaintiffs challenge the Secretary's determination that the gun turrets which were produced at Culpeper are merely components of light armored vehicles imported from Canada. Specifically, plaintiffs object to the Secretary's application of *United Shoe Workers of America, AFL-CIO* v. *Bedell,* 506 F.2d 174 (D.C. Cir. 1974) to this case and argue that "the relationship of shoe counters to shoes is NOT analogous to the relationship of gun turrets to light armored vehicles. All shoe counters are, of necessity, a part of shoes; all gun turrets are *not,* of necessity, a part of light armored vehicles." Plaintiffs' Brief at 3.

Under the statute, the Secretary must determine whether "increases of imports of articles like or directly competitive with articles produced by such workers' firm * * * contributed importantly to such total or partial separation * * *." 19 U.S.C. § 2272(3). In making this determination, courts have "established that an imported article is 'like or directly competitive' with a domestic product if it is 'interchangeable with or substitutable for' the article under investigation." *International Brotherhood of Electrical Workers, Local 1160* v. *Donovan,* 10 CIT 524, 527, 642 F. Supp. 1183, 1186 (1986). Where an article is a component of a finished end product, the courts have looked to imports of those components, but not of finished end products, in determining whether worker separations were caused by imports. *See, e.g., United Shoe,* 506 F.2d 174 (interpreting the statutory "like or directly competitive" standard, under the Trade Agreements Extension Acts of 1951 and 1955 and the Trade Expansion Act of 1962); *International Union, United Auto., Aerospace & Agric. Implement Workers of America, UAW, Local 834* v. *Donovan,* 8 CIT 13, 592 F. Supp. 673 (1984) (interpreting the same standard under the Trade Act of 1974) and cases cited therein. *But see,* 19 U.S.C. § 2481(5) (1982); 19 C.F.R. § 90.2 (1986); *United Shoe,* 506 F.2d at 186 nn. 79–80; *United Steelworkers* v. *Donovan,* 10 CIT 147, 632 F. Supp. 17, 22–23 (1986); *ILWU Local 142* v. *Donovan,* 10 CIT 161, Slip Op. 86–28, at 7–9 (Mar. 13, 1986) (articles at different stages of production may be "directly competitive if they have the same competitive effect on each other as articles at the same stage of production).

A review of trade adjustment assistance cases indicates that plaintiffs are correct in noting that under *United Shoe* (and its progeny) necessary or intrinsic parts of end products have been treated as non-competitive components of such end products. In *United Shoe* the court found that imports of completed women's shoes were not like domestically produced shoe "counters." 506 F.2d

at 177–78 and n.13. As the court noted, "A counter is a necessary component of a normal shoe because the leather in the heel of the shoe could not hold its shape without the reinforcement the counter provides." 506 F.2d at 178 (footnote omitted). In other cases, imported color television sets were found not to be "like or directly competitive" with certain domestically produced parts of television sets, such as printed circuit boards, fly backs, deflection yokes and picture tubes. *Morristown Magnavox Former Employees* v. *Marshall,* 671 F.2d 194 (6th Cir.) *cert. denied* 459 U.S. 1041 (1982); *International Brotherhood of Electrical Workers, Local 1160* v. *Donovan,* 10 CIT 524, 642 F. Supp. 1183. Similarly, domestically produced car batteries, wheel and body parts have been viewed as components of, and therefore not like or directly competitive with, imported cars. *UAW, Local 834* v. *Donovan,* 8 CIT 13, 592 F. Supp. 673; *Holloway* v. *Donovan,* 7 CIT 237, 585 F. Supp. 1427 (1984); *ACTWU, Local 1627* v. *Donovan,* 7 CIT 212, 587 F. Supp. 74 (1984). In various other trade adjustment cases articles that constitute a necessary part of, or a necessary factor in the production of, a product have been considered non-competitive components of that product. *See Gropper* v. *Donovan,* 6 CIT 103, 569 F. Supp. 883 (1983) (imported knit fabric garments did not compete with domestic finished fabric used for production of knit fabric garments); *Machine Printers & Engravers Ass'n* v. *Marshall,* 595 F.2d 860 (1979) (imported textile fabrics did not compete with domestically produced engraved rollers and screens used to print designs on fabric); *Dan Stipe* v. *U.S. Department of Labor,* 9 CIT 543 (1985) (imported raw steel not competitive with domestic steel products such as tunnel liner and sectional plate produced by plaintiff's firm).

In this case, the Secretary's determination that gun turrets are to be treated as "components" of LAVs rather than as additional imported products is only supported by evidence that the turrets are produced as part of DDGM's LAV program for sale to the U.S. Marines. R. 33. Petitioner has made references to evidence which may have a bearing upon the nature of gun turrets, their relationship to LAVs, and their country of origin. Plaintiffs' Response at 1–3. Some of them were incorporated in the administrative record, R. 2, 49, others apparently were not. Plaintiff's Response at 3 ("A copy of a representative label was submitted to the Department of Labor but has been omitted from the administrative record."). The Secretary did not focus its investigation on either the precise relationship between gun turrets and LAVs,[2] or upon the specific im-

---

[2] General Motor's response to the Secretary's questionnaire touches upon the relevant issue but is inconclusive.
In response to a request to "Describe in detail all products and/or components manufactured at the petitioners' plant ˙  ˙" General Motors replied that the "Only product was assembly and test of turrets for Light Armored Vehicle program for sale to DDGM of Canada and subsequent sale to U.S. Marines." R. 33 (question I B ).
General Motors was also asked "Does the firm import any products (including components) which are like or directly competitive with the products manufactured at the petitioners' plant? Describe these imports." R. 34 (question II.B.) It appears that General Motors' initial response was that "DDGM imports turret to U.S. for LAV program." *Id. See* R. 53 & 58. The word "imports" is crossed out and replaced with the word "exports." R. 34. Accompanying this change is the following explanation from Doug Schmude, OTAA (Office of Trade Adjustment As-

portations of gun turrets. It is apparent from the record that once the Secretary learned that Delco's gun turrets were sold to DDGM in Canada, its investigation essentially ceased.

If investigated in earnest, the Secretary might very well conclude that, apart from any other circumstances, the turrets should not be treated as "components." That is, even under the standard accepted by the Secretary, he or she must decide whether the gun turrets are imported as distinct articles from the LAV's. *See United Shoe,* 506 F.2d at 184 ("Congress did not intend protections to encompass domestic manufacturers of products of a type not imported as distinct articles").[3]

In any event, given the unique factual situation apparent from the record, it seems anomalous to decline certification on the basis that the gun turrets are "components." As explained in *Woodrum* v. *Donovan,* 5 CIT 191, 564 F. Supp. 826 (1983), *aff'd,* 737 F.2d 1575 (Fed. Cir. 1984) the distinction found in the statute among service employees had a rational basis because "it was reasonable for Congress to provide benefits to those workers whom it considered most immediately and directly affected by imports of like or directly competitive articles, namely, the employees of the firm producing the import-impacted articles." 5 CIT at 201, 564 F. Supp. at 834. *See Woodrum* v. *United States,* 737 F.2d 1575, 1576. A similar basis for drawing distinctions between employees in firms producing end products and those in firms producing components is apparent when one is discussing shoes in general as not directly competitive with shoe counters, or cars in general as not directly competitive with car batteries. *See United Shoe,* 506 F.2d at 180–81 and 183–84. Many factors may intervene in these situations which affect the impact of the imports on the domestically produced item. This basis for the component/end product distinction seems to bear no relation to the situation of a production facility that is moved abroad under the circumstances described in the record. The impact is as direct as it can be. In this case, the Secretary concluded in essence that there is no imported product which is "like or directly competitive" with the gun turrets produced by the plaintiff's firm. Yet, the gun turrets entered from Canada appear to be the same gun turrets sold to the same customer in the same relation to the LAV's as existed before the relocation of the plant. This leaves the court in considerable doubt as to the Secretary's reason for apparently deciding that Congress intended that eligibility in a case such as this could be denied based on the component/end product distinction. If the Secretary has a reasonable basis for concluding that Congress intended such a distinction to bar eligibility here, he or she should ex-

sistance: "I called Ms. Bonnie Gardner of General Motors today concerning question II.B and she said that the answer should be amended to read DDGM exports the light armored vehicle which includes the component (turret) to the U.S." *Id.* It is unclear whether the characterization of turrets as components is that of General Motors' Ms. Gardner or OTAA's Mr. Schmude.

[3]It appears to the court that overly fine tariff distinctions should not be applied to deny eligibility where common sense indicates Congress intended it.

plain the reason for so interpreting the statute. In any case, the Secretary's factual determination cannot be sustained on the basis of the meager and apparently incomplete record before the court.

## II. LOST EXPORT SALES RESULTING FROM A SHIFT OF PRODUCTION TO A FOREIGN COUNTRY.

The Secretary also has asserted that this case involves lost export sales and concludes that lost export sales do not provide a basis for certification under the Trade Act of 1974.

The Secretary's determination that this case involves "lost export sales" reveals a similarly mechanistic approach to this case which disregards the specific factual circumstances underlying the production, exportation, importation, and sale of these turrets. The record reveals that prior to the close of the Culpeper facility the gun turrets at issue were produced domestically for ultimate sale in the U.S. Their production was undertaken pursuant to a contract for sale to the United States Government. They were exported to Canada in a transfer between related companies, and re-imported to the U.S. for the purposes of sale to the U.S. Marines.

Although it is true that lost export sales do not provide a basis, in and of themselves, for certification, the Secretary has provided no authority for concluding that the statute precludes certification in cases involving lost export sales where all of the statute's requirements are otherwise met. Furthermore, defendant's counsel has not attempted to provide specific support for such a reading of the statute.

It may be that the Secretary's conclusion is based upon nothing more than a general impression that imports do not compete with exports, and that increased imports ordinarily would not bring about lost export sales. In this case, however, the secretary has chosen to apply the term "lost export sales" to a set of facts which might satisfy the statutory requirements of competition and causation. Under these circumstances, the Secretary may not rely upon assumptions as to whether lost export sales in general are capable of meeting the statute's requirements, but must apply the specific facts of this case directly to the statute's requirements. *Cf. ILWU Local 142* v. *Donovan,* 10 CIT 161, Slip Op. 86–28, at 9–11 (March 13, 1986) (the fact that imported articles were later exported does not relieve the Secretary of the obligation to determine whether those imports "contributed importantly" to the workers' separation).

In the Secretary's negative determination regarding reconsideration, he refined his conclusion to "[l]ost export sales resulting from a shift of production to a foreign country is not a basis for certification * * *." 51 Fed. Reg. at 37798. The additional circumstance of a shift from domestic to foreign production, in itself does not appear to be determinative. To the contrary 19 U.S.C. § 2394 indicates that the statute may apply to such a situation. In a case involving sepa-

rations from a firm's domestic plant and imports from that same firm's foreign plant, the court has noted that it "finds nothing in the legislative history or judicial interpretation of section 223(3) which would exclude from coverage workers separated because their own company 'imports articles like or directly competitive' with articles produced domestically." *Chapman* v. *Donovan,* 9 CIT 545, 548 n.2 (1985). *See International Union, United Auto., Aerospace & Agric. Implement Workers of America, UAW, Local 834* v. *Donovan,* 8 CIT 13, 18–19, 592 F. Supp. 673, 678 (1984) (imports from a firm's foreign plant did not "contribute importantly" to separations from that firm's domestic plant, where such imports were *de minimis* compared to total domestic production and accounted for only 2.9% of lost sales at the firm's domestic plant).

Upon remand, the Secretary is to determine whether increased imports contributed importantly to plaintiffs' separations. Normally, the Secretary might only be concerned with increases in imports which occur prior to and up to the time of worker separations. There does not appear to be anything *per se* improper, however, with considering imports that occurred after the worker separations at issue, so long as the Secretary provides a valid explanation of how such imports were "likely to affect employment in the year of separation," *United Steelworkers of America* v. *Donovan,* 10 CIT 147, 632 F. Supp. 17, 21 (1986).

In this case, the limited production of gun turrets, coupled with General Motors' decision to consolidate Delco's production of gun turrets with DDGM's LAV facilities in Canada, suggest a strong connection between plaintiffs' separations and any subsequent increased imports of gun turrets (with or without the LAVs) from DDGM. Thus, even if imports of the relevant product did not occur or increase until after plaintiffs' separation, it still might be reasonable to conclude that, under the circumstances, increased imports contributed importantly to plaintiffs' separations.

In addition, the Secretary is to consider another aspect of the question of whether causally related "imports" increased. If the Culpeper gun turrets, as opposed to Canadian gun turrets, are considered to be "imports" simply because they were returned to the United States, "imports" likely did not increase. It is not clear from the statute or from the record that the Culpeper gun turrets must be so considered. A reasonable interpretation of the statute must be applied to the facts of this case. A recitation of conclusions unrelated to the statutory criteria and plaintiffs' particular claims is insufficient.

Because the Secretary denied eligibility based on vague reasoning and on unsupported findings that this case involved only "lost export sales" or production of non-competitive "component parts," the decision of the Secretary cannot be sustained as supported by substantial evidence, nor is the decision in accordance with law. The

case is remanded and the Secretary shall determine in accordance with this opinion whether the eligibility requirements of the statute have been set.

Remand results shall be reported in forty-five days of this opinion.