## MORRISTOWN MAGNAVOX FORMER EMPLOYEES, Petitioners,

v.

## F. Ray MARSHALL, Secretary, Department of Labor, Respondent.

### No. 80–3034.

United States Court of Appeals, Sixth Circuit.

Argued June 8, 1981.

Decided Feb. 17, 1982.

Rehearing and Rehearing En Banc Denied April 5, 1982.

Mark E. Olive, Knoxville, Tenn., for petitioners.

Diddo Clark, U. S. Dept. of Labor, Washington, D. C., for respondent.

Before EDWARDS, Chief Judge, WEICK, Senior Circuit Judge * and PHILLIPS, Senior Circuit Judge.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

This is the first case in this court involving construction of the provisions of the Trade Adjustment Assistance Act of 1974, 19 U.S.C. §§ 2271–2274. The facts in this case include the following. A plant which produced electronic components for Magnavox color televisions (supplying 80% of Magnavox' requirements) was located at Morristown, Tennessee. It closed August 24, 1979, displacing 575 workers. There was no union organization in the plant, and the application for benefits was filed by three ex-employees averring:

Due to recent increases in Japanese imports the company in an effort to stay competitive in the market place, has been forced to close the Morristown plant and consolidate with Greeneville. The primary reason for taking this action is the very strong price competition from foreign imports.

The workers were not represented by counsel in the processing of this petition, and the Secretary of Labor determined "increases of imports of articles like or directly competitive with articles produced by the [petitioners'] firm" had not "contributed importantly" to the separations and to the absolute decline in sales or production.

The Secretary also contended:

Evidence developed during the course of the investigation revealed that the Morristown and Johnson City, Tennessee plants of the Magnavox Consumer Electronics Company were permanently closed when the company decided to consolidate production operations at the Greeneville and Jefferson City, Tennessee plants, respectively.

The Morristown, Tennessee plant of Magnavox primarily produced television printed circuit boards, flybacks and deflection yokes. These products were used only in the production of color televisions for the Magnavox Company. The Morristown plant officially closed on August 24, 1979 and all production operations were shifted to the Greeneville, Tennessee plant. Total company sales of color televisions increased absolutely from 1977 to 1978. In the first seven months of 1979 compared to the same 1978 period, total sales did not change significantly.

Petitioners contend:

It is arbitrary and irrational to conclude that the cause for consolidation is irrelevant under the Act. If one cause of consolidation was increased imports, and that cause was as great as any single other cause, then affected workers must be certified under the Act.

\* \* \* \* \* \*

Magnavox officials closed the Morristown, Tennessee plant in order to "improve production efficiencies vital to retaining a competitive position in the industry." (App. 118.) An analysis of past import increases and expected future import concessions reveals the reasons domestic production efficiency must be increased.

\* \* \* \* \* \*

* Judge Weick took Senior status on Dec. 31, 1981.

Imports of color televisions increased 179.8 percent in 1976. (App. 21.) In the last quarter of 1976, imported color televisions took a 43.9% share of the domestic market. (App. 66.) The color television industry never recovered from this staggering market penetration. American industry has been unable to compete with the lower prices of imported televisions, (App. 23, 69) made possible by "increasingly significant advantages from production activities in lower labor cost areas of the world." (App. 67.)

\*     \*     \*     \*     \*     \*

In the second half of 1978 when Magnavox management determined the Morristown plant had to be closed, increased imports must have been a major consideration. The industry and the company had been and were in a poor position. The future looked worse.

The Secretary's brief response to this argument by petitioners is as follows:

"[T]he dominant cause of the layoffs was a domestic transfer of production, increased imports did not 'contribute importantly.' Magnavox did not transfer production from one plant to another because it was hurt by increased imports. The company did not appear to be hurting. *Its* production of color televisions was *increasing*. Sales were not decreasing. *Magnavox did not increase its reliance on imports of the components which had been produced by the petitioning workers.*"

Sec.'s Brief at 15 (emphasis added). He concludes:

Magnavox may have had higher sales but for the level of imports (*see* App. 93), but loss of *potential* sales is not a cognizable injury under section 222 of the Trade Act.

The statute under which this action is brought establishes three requirements for eligibility as follows:

The Secretary shall certify a group of workers as eligible to apply for adjustment assistance under this part if he determines—

(1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation or threat thereof and to such decline in sales or production.

For purposes of paragraph (3), the term "contributed importantly" means a cause which is important but not necessarily more important than any other cause. 19 U.S.C. § 2272.

Petitioners' argument centers primarily upon the first and second standards of eligibility. As to the first and second, there is no question but that the facts in this case establish that 575 workers at the Morristown, Tennessee, plant of Magnavox have been eliminated, and thus the employment in a Magnavox "subdivision" has not only decreased, it has absolutely vanished. As to the third requirement, the situation is, however, quite different. Much of the discussion in our court both in briefing and oral argument has concerned whether or not the Japanese competition complained of by petitioners "contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production."

In terms of ordinary logic, the fact is that Japanese imports of color television sets increased by 179.8% in 1976. These imports plus those of 1978 and 1979 accounted for an enormous displacement of American color television sales. Nonetheless, the Secretary has found "the dominant cause of the layoffs was a domestic transfer of production; increased imports did not contribute importantly." In this regard, the Secretary relies on the fact that Magnavox as a whole was not decreasing production because its sales were not decreasing.

We do not seek now to determine whether nonetheless the important impact of Japanese television sets was an important contributing factor to the closing of the Magnavox plant. The reason for this is that the Secretary has also determined that the articles manufactured at the Morristown plant were not displaced by "imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof."

In *United Shoe Workers of America v. Bedell*, 506 F.2d 174 (D.C.Cir.1974), Judge Spottswood W. Robinson, III (now Chief Judge of the U.S. Court of Appeals for the D.C. Circuit) made a careful analysis of the legislative history of the statutory language we now construe and concluded that the statutory benefits provided by the Act were not available to workers displaced in the plant of a company which manufactured only a single component of a shoe whereas the foreign competition complained of consisted of importation of the finished product. Reviewing Judge Robinson's lengthy opinion and the legislative history recited therein, it appears clear that Congress specifically considered the very issue presented here and deliberately chose the limited language which we now are required to apply in this case.

The Magnavox plant, as indicated in the recital of facts above, produced printed circuit boards, flybacks and deflection yokes. The Japanese competition complained of by petitioners pertains to importation of completed color television sets.

There is, of course, no question but that the results reached in the *United Shoe Workers* case and in this case demonstrate a legislative disparity of treatment of workers affected by a somewhat comparable foreign competition problem. Where Congress has given careful thought to the distinction complained of, the choice arrived at is within the legislative power of Congress. Judge Robinson held also as follows:

> The ultimate question in this controversy is what is imported within the meaning of the word "like" as used in Section 301(c)(2) of the Trade Expansion Act of

1962, when a finished imported shoe enters the United States—is it the shoe or the counter? We respond, the shoe.[83]

\*     \*     \*     \*     \*     \*

In holding that "like" must be construed as we do today, we are mindful of the remedial purpose of the adjustment assistance provisions. Those provisions are designed to extend relief to manufacturers and workers who, in consequence of governmental action, find themselves idle or jobless. Such remedial legislation should be construed broadly to effectuate its purpose. But we cannot attach to a statute any objective that would negate the limits clearly intended by the legislature. Congress has made a policy decision and drawn a line; our duty is to give the language of the statute a meaning that will carry out that policy. The result may appear harsh in this day of high unemployment and rising cost of living, but the remedy for congressional policies that do not extend beyond lawful bonds is in the legislature.

---

[83] Appellants maintain that this reading of the Act infers a "congressional idiosyncracy." *United States v. Brown*, 333 U.S. 18, 26, 68 S.Ct. 376, 380, 92 L.Ed. 442 (1948); *cf. Keifer & Keifer v. R.F.C.*, 306 U.S. 381, 393, 59 S.Ct. 516, 520, 83 L.Ed. 784 (1939). Appellants argue that the exclusion of parts manufacturers and their employees is an arbitrary and incongruous result. We reject that contention. Our construction neither subtracts from nor adds to the congressional purpose; it merely leaves it intact. See *62 Cases of Jain v. United States*, 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566 (1951).

While it seems clear to us that the petitioners here may have suffered loss of jobs from the general impact on the television market of foreign competition, it does not appear that Congress has ever provided adjustment to them or people in their general classification. The restriction in the bill of such adjustment to job loss resulting from competition of "like or directly competitive" products has been repeatedly criticized and debated in Congress. But to date all proposals to eliminate or mitigate these two restrictions have been defeated.

Even the 1974 Act which in some respects liberalized adjustment assistance retained the "like or directly competitive" restrictions. And in the legislative history we find the Senate Report on the bill citing Judge Robinson's opinion in *Shoe Workers v. Bedell, supra,* with apparent approval.

The term "like or directly competitive" used in the bill to describe the products of domestic producers that may be adversely affected by imports was used in the same context in section 7 of the 1951 Extension Act and in section 301 of the Trade Expansion Act. The term was derived from the escape-clause provisions in trade agreements, such as article XIX of the GATT. The words "like" and "directly competitive," as used previously and in this bill, are not to be regarded as synonymous or explanatory of each other, but rather to distinguish between "like" articles and articles which, although not "like", are nevertheless "directly competitive." In such context, "like" articles are those which are substantially identical in inherent or intrinsic characteristics (i.e., materials from which made, appearance, quality, texture, etc.), and "directly competitive" articles are those which, although not substantially identical in their inherent or intrinsic characteristics, are substantially equivalent for commercial purposes, that is, are adapted to the same uses and are essentially interchangeable therefor.

The Committee notes that the term "like or directly competitive" as used in sections 201 and 405(4) of the Trade Expansion Act of 1962 has been the subject of recent court action. The courts, in upholding the Commission, concluded that imported finished articles are not like or directly competitive with domestic component parts thereof. *United Shoe Workers of America, et al. v. Catherine Bedell, et al.,* Civil Action No. 2197–71 (D.D.C., filed May 9, 1972) [506 F.2d 174], (D.C.Cir.1974).

S.Rep.No.93–1298, 93rd Cong., 2d Sess., reprinted in [1974] U.S.Code Cong. & Ad. News 7,186, 7,265–266.

We believe that we are required to hold that component parts of a television set are not "like" a completed television set within the meaning of the statute at issue and that imports of fully completed television sets are not directly competitive with the manufacture of printed circuit boards, flybacks and deflection yokes.

For these reasons, the Secretary's determination is affirmed.