**UNITED MINE WORKERS OF AMERICA, Plaintiff,**

**v.**

**William Emerson BROCK, III, Secretary of Labor of the United States of America, Defendant.**

Court No. 86–08–01034.

United States Court of International Trade.

June 3, 1987.

Kuhn, Engle & Stein (James C. Kuhn, III), Pittsburgh, Pa., for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Dir., Commerical Litigation Branch, Washington, D.C. (Velta A. Melnbrencis), Civ. Div., U.S. Dept. of Justice, New York City, for defendant.

### OPINION

RESTANI, Judge:

Plaintiff, United Mine Workers of America, Local 1269, challenges a negative determination of the Secretary of Labor regarding eligibility for governmental assistance for workers whose loss of employment is, in whole or in part, caused by certain imports. 19 U.S.C. § 2271 et seq.

(1982) (Supp. III 1985).[1] Plaintiff's petition, dated December 1985, covers workers employed by Barnes & Tucker Coal Company, a wholly owned subsidiary of Alco Standard Co., at mines numbered 20, 24–B, 24–D and 25, in central Pennsylvania. The workers were separated between 1982 and 1986 for various reasons, but it appears undisputed that an important reason for some separations was the increase in imports of foreign steel into the United States. A large portion of the coal produced at the mines was used for making coke for steel production. Less clear is whether imports of coke caused any separations. Whether or not imports of steel and coke caused separations, other requirements for eligibility must be met. Plaintiff argues that the Secretary's negative decision on eligibility was unsupported by substantial evidence, was not the product of reasoned analysis and that vital mistakes of facts were made. The court disagrees. The decision of the Secretary may appear unreasoned or unreasonable because the application of the relevant statute to the facts at hand produces a harsh result as to some workers. The distinctions drawn in the statute, however, have been found to be rationally based and the Secretary applied the statute appropriately.

### Employees at Mine No. 25

The workers covered by the petition who were separated first were those at Mine No. 25. The record indicates that production ceased at Mine No. 25 in 1983. Any workers separated from Mine No. 25 in 1982–83 seeking assistance would have had to have been covered by a petition filed no

later than 1984. 19 U.S.C. § 2273(b)(1) (1982).

■ The precedents on this point are clear. There is no possibility of waiver of the statutory requirement that "[a] certification of eligibility ... shall not apply to any worker whose last total or partial separation from the firm ... occurred ... more than one year before the date of the petition on which such certification was granted...." 19 U.S.C. § 2273(b)(1). *Lloyd v. United States*, 637 F.2d 1267 (9th Cir.1980); *Former Employees of Westmoreland Manufacturing Company v. United States*, 10 CIT ——, 650 F.Supp. 1021 (1986); *Former Employees of Travenol Laboratories, Inc. v. United States*, 11 CIT ——, Slip Op. 87–24 (March 11, 1987) [Available on WESTLAW, DCT database]. Thus, if certification were to be based on the petition filed in December 1985, no employee separated from Mine No. 25 in 1982–83 could obtain benefits based on such certification. Plaintiff argues in response that the workers employed by Barnes and Tucker at Mine No. 25 were actually employees of Inland Steel Company and, as such, should be covered by an earlier successful petition. Thus, plaintiff argues, the workers represented here also are eligible for benefits.[2]

■ The workers at Mine No. 25 who are represented here were employees of Barnes and Tucker at the time of their separation. Whether or not these workers also may be considered "laid off workers of Inland Steel," they were not covered by the certification resulting from the earlier petition because they were separated too early.[3] The certification applies only to work-

1. Various statutory amendments enacted in 1986 do not apply. The negative decision and the denial of reconsideration are found at 51 Fed.Reg. 22990 (June 24, 1986) and 51 Fed.Reg. 28142 (August 5, 1986), respectively.

2. The petition referred to led to Investigation TA–W–15, 279, cited at p. 93 of the Record and resulted in a certification, summarized at 49 Fed.Reg. 29,880 (1984). Inland Steel Co. owned Mine No. 25 throughout the relevant period. It operated the mine in 1982–83.

3. Plaintiff provided no evidence of any employment relationship between the workers repre-

sented here and Inland Steel, except for an indication in its brief that the former Barnes and Tucker employees at Mine No. 25 had preferential hiring rights at Inland Steel. Whether this or any other factor makes Inland the workers' "firm" need not be decided. Because the passage of time bars the claims of the Mine No. 25 employees, the court does not reach the issue of whether any imports competing with articles produced by the Mine No. 25 workers' "firm" caused the 1982 separations. *See* 19 U.S.C. § 2272(3) and, *infra*, discussion.

ers separated on or after March 14, 1983. 49 Fed.Reg. 29,880 (1984). The Barnes and Tucker employees at Mine No. 25 represented by plaintiff were separated in 1982. The earlier certification did not reach them.[4] Pursuant to 19 U.S.C. § 2395, plaintiff could have challenged that certification within sixty (60) days of its publication. The time for judicial challenge to that certification has long since passed and had passed at the time of the filing of this action.

### Employees at Mine No. 20

■ Mine No. 20 was continuously owned by Barnes and Tucker throughout the relevant period. It produced coal for sale abroad and for steam production at electric utilities in the United States. The workers at Mine No. 20 were separated between November 1985 and February 1986. The Secretary stated that these workers were denied certification because part (3) of 19 U.S.C. § 2272, the basic eligibility provision, was not met. That part requires that "increases of imports of articles like or directly competitive with articles produced by [the] worker's firm [must have] contributed importantly to ... separation...." 19 U.S.C. § 2272(3) (1982) (Supp. I 1983). The question of which articles are to be compared for purposes of § 2272(3) is clear as to the production from Mine No. 20. Mine No. 20 produced coal suitable for steam and possibly for steel production in the United States, but coal from Mine No. 20 was not sold for domestic steel production during the relevant period. Thus, if Mine No. 20 is considered in isolation, steel imports into the United States are irrelevant as to separations there.[5] Under such an analysis the issue then becomes whether increasing imports of *coal* contributed to separations.[6]

The statistics provided by the Department of Energy for 1981 to 1985 are almost flat for coal imports. Such imports can hardly be said to be "increasing." Focusing on the two types of coal at issue, in the period 1983–1985, one observes slightly improved U.S. production and export levels. A slight bulge in steam coal imports was dwarfed by an increase in steam coal exports. Finally, imports of coal for steel production were so insignificant that no records of them were kept. The record also indicates that Barnes and Tucker customers purchased no imported coal in 1984 and 1985. Thus, there is no basis for finding that coal imports caused separations at Mine No. 20.

### Employees at Mine No. 24–B and D

It is not clear from the record whether Mine No. 24–B produced coal for steel production during the relevant period, but both Mines No. 24–B and D were owned by Jones and Laughlin Steel Company, later LTV Steel Company, before they were acquired by Barnes and Tucker in October 1982. If Mine No. 24–B produced only coal for steam during the relevant period, the analysis in the previous section is applicable; if it did produce coal for domestic steel production, the following analysis applies.

There seems to be agreement that increasing steel imports were a contributing cause of separations in 1985 and 1986 at Mine No. 24–D. Unfortunately, for the workers from Mines No. 24–D, who probably care little about the corporate distinctions which exist, Barnes and Tucker does not produce the end-product-steel;[7] it pro-

---

**4.** It is unlikely that the Barnes and Tucker employees ever could have obtained benefits under the earlier petition. The one-year rule probably barred them as to that petition as well.

**5.** Similarly, coke imports would be irrelevant.

**6.** The Energy Department keeps separate statistics on coal for steam and coal for steel production. Plaintiff claims the two are interchangeable, so both will be discussed.

**7.** Defendant maintains that had the mine been related to a steel producer

steel could be considered as the article produced by the "workers' firm" because the term "workers' firm" includes "an appropriate subdivision thereof." 19 U.S.C. § 2272(3). Defendant's Memorandum at 22. *See* 49 Fed. Reg. 29,880 (1984) (issuing a certification to all Inland Steel workers at Mine No. 25 separated after March 14, 1983; the underlying determination, TA–W–15,279, concluded that "increases of articles like or directly competitive with steel products manufacture[d] at Inland Steel's Indiana Harbor Works, contributed importantly to the decline in sales or production and to the

duces coal, which is analogous to a component part. Coal is not a substitute for steel, which is the equivalent of a finished product. (Barnes and Tucker's parent corporation does not produce steel).[8] Under well-established precedents, imports of end-products do not compete with and are not "like" components. 19 U.S.C. § 2272(3). *See e.g., United Shoe Workers of America, AFL–CIO v. Bedell,* 506 F.2d 174, 186–87 (D.C.Cir.1974) (under predecessor statute shoes are not "like or directly competitive" with shoe counters; court also details attempts to amend provision); *International Union, United Auto, Aerospace and Agricultural Employment Workers of America v. Donovan,* 8 CIT 13, 20, 592 F.Supp. 673, 679 (1984) (automobiles are not "like or directly competitive" with automobile wheels and body parts). In *Julian R. Woodrum v. Donovan,* 5 CIT 191, 201, 564 F.Supp. 826, 834 (1983), *aff'd,* 737 F.2d 1575 (Fed.Cir.1984), the court found that the distinctions among employee groups caused by the standards of § 2272 had a rational basis because of the greater probability of immediate and certain impact on a firm's employees from imports like the raw material or components produced by the firm, as opposed to imports which are like the finished product produced by another firm. Thus, steel imports (the finished products) are not an eligibility triggering factor. The possible effects of imports of coal have already been discussed and eliminated as a contributing cause of separation.

The Secretary's decision with regard to coke imports is less than clear, but it appears that he considers coke another form of metallurgical coal, that is, it is "a later stage of processing for metallurgical coal." Record at 86. Therefore, the Secretary seems to consider imported coke to "compete directly" with coal suitable for domestic steel production. Overall, coke imports decreased slightly from 1984 to 1985 while exports increased. It appears further from the record that an increase in imports from 1983 to 1984 was almost offset by exports, and import-export statistics for 1982 and 1983, years of low domestic steel and coke production, show dips from 1981 statistics. 1981 statistics resemble those of 1984 and 1985. One could argue about what such general statistics show. In view of the most relevant statistics, however, that is, those for 1984–85 and in view of the record evidence that none of Barnes and Tucker's customers bought imported coke in 1984–85, one would be hard pressed to find that increases in coke imports contributed importantly to the separations. The court cannot find the Secretary's decision in this regard to be unsubstantiated by the evidence of record.

Although it was not specifically noted in the record, it seems likely that the closings of the last three mines discussed here were related. The record shows that a decision was made in 1984 to close them, and all were closed in 1985–86. It is not necessary

total or partial separation of workers at Mine No. 25 of Inland Coal Company." (Attachment to Defendant's Opposition)). *But cf. IBEW, Local 1160 v. Donovan,* 10 CIT ——, 642 F.Supp. 1183 (1986) (in the absence of a challenge to the Secretary's finding that certain RCA workers produced color television tubes, the court did not consider the television sets produced by RCA as the article produced by the "workers' firm" and consequently, held that "the Secretary properly confined the scope of the investigation to ascertain whether imports of color television picture tubes contributed importantly to the workers' separation"); *Morristown Magnavox Former Employees v. Marshall,* 671 F.2d 194 (6th Cir.), *cert. den.,* 459 U.S. 1041, 103 S.Ct. 458, 74 L.Ed.2d 610 (1982); and *compare Machine Printers and Engravers Association of the United States v. Marshall,* 595 F.2d 860 (D.C.Cir.1979) (court states that benefits are denied because relevant firm has "no corporate relationship" to the textile manufacturer and textile imports caused injury). In view of the fact that the government takes a position seemingly more favorable to plaintiff than that represented by the *IBEW* and *Morristown* cases, the court need not decide the legal issue presented or whether the cases are factually distinguishable from the situation described by defendant.

**8.** Plaintiff may have implied that the concerned employees were actually workers of the "firm" of Jones and Laughlin Steel Company or LTV Steel Company for purposes of 19 U.S.C. § 2272(3). This argument would have some appeal if the separations had occurred at or about the time of the change in corporate ownership of the mines, but the three-year hiatus makes it clear that the "firm" at the time of separation was the independent coal producer, Barnes and Tucker.

to discuss this interrelationship further, because the court has sustained the Secretary's decision that no appropriately competing and increasing imports contributed importantly to any of the separations at Mines Nos. 20, 24–B or 24–D. For the same reason it is not necessary to resolve the issue of whether all the coal mined at the three plants was suitable for domestic steel production, and what this signifies. Whether considered separately or together the causes of the separations at the three mines do not require a certification of eligibility for readjustment benefits.

Although the result reached here seems harsh because workers denied eligibility in some cases worked side by side with those who were certified, the Secretary's decision of no certification of eligibility must be sustained.