**SUGAR WORKERS UNION, LOCAL 1660, ILA, AFL–CIO, Plaintiffs,**

v.

**Elizabeth DOLE, Secretary of Labor, United States Department of Labor, Defendant.**

**Court No. 88–08–00670.**

United States Court of International Trade.

Dec. 21, 1990.

Kelley Drye & Warren (Eugene T. D'Ablemont, Joel E. Cohen and Cynthia A. Epstein), New York City, for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (Velta A. Melnbrencis), New York City, for defendant.

OPINION

MUSGRAVE, Judge.

BACKGROUND

Plaintiffs in this action challenge the refusal of the Department of Labor ("Labor") to certify as eligible to apply for worker adjustment assistance the former employees of the Amstar Sugar Corporation's Bunker Hill sugar refining plant in Charlestown, Massachusetts. Before it was closed in 1988 the plant refined raw sugar for sale to producers of various sugar-containing products. Plaintiffs challenged Labor's prior final determination that the plaintiffs' separation from employment was not attributable to increased imports into this country of raw or refined sugar during the relevant time period. In slip opinion 89–119 of 25 August 1989, 1989 WL 101398, this Court remanded the matter to Labor with instructions that Labor consider the effect, if any, on plaintiff's separations of imports of sugar blends and sugar substitutes during the period; in particular the Court directed Labor's attention to a report by the General Accounting Office ("Report") alleged by plaintiffs to describe increases in imports of such items competing with the items produced by plaintiffs.

On remand, Labor determined that the Report "contained very little that could be considered in Labor's determination", Defendant's Memorandum in Opposition to Plaintiff's Motion Pursuant to Rule 56.1 ("Opposition") at 13, and that in any event the available data on imports of sugar blends and substitutes during the relevant period provided no basis to alter Labor's prior determination of ineligibility. With respect to the former argument, Labor emphasizes that the Report estimated the lev-

el of 1987 imports of sugar-containing products "irrespective of whether domestic production was displaced", *id.*, and also that the Report "concerned allegations of illegal activities whereby sugar was imported ostensibly for use in the manufacture of sugar blended products either for export or for entry into the U.S. market.[1]" With respect to the latter, Labor states that the data on sugar blends and substitutes presented in the Report suggests that imports of such products during the relevant period were not substantial enough to have contributed importantly to plaintiffs' separation from employment as required to qualify plaintiffs for adjustment assistance.

Plaintiffs dispute Labor's remand determination on several grounds. First, plaintiffs contest Labor's finding that the Report did not address the magnitude of U.S. imports of sugar blends and substitutes. Plaintiffs assert that the Report and several of its appendices indeed contain such information in the form of statistical estimates and data on the imports of sugar-containing articles, including sugar substitutes. Plaintiffs' Memorandum of Law in Support of its Rule 56.1 Motion ("Memorandum") at 17–24. Plaintiffs also propose a somewhat different, more complex analysis of the information contained in the Report. Plaintiffs argue that it was the combination of imports of sugar-containing or sugar-substitute products along with alleged market perversions wrought by the system of quantitative restrictions on sugar imports maintained by the U.S. Government that caused or contributed importantly to the termination of operations at the Bunker Hill refinery. Plaintiffs argue that the situation of their industry is unlike the normal situation in which "the absence of substantial increases of purchases of imported like or directly competitive articles by customers of the closed plant" would disqualify its former workers from eligibility. In the sugar industry, plaintiffs claim, the increase in imports of sugar blends and substitutes, even if those imports were not for the most part purchased by the custom-

ers of plaintiffs' plant, resulted in a reduction in the overall domestic demand for raw sugar, which reduction in turn led to a decrease in the amount of sugar allowed to enter the country under the quota program; thus, less raw sugar was available, and at higher prices, for domestic refineries like Bunker Hill, and such refineries were therefore forced to reduce production. This result was compounded, plaintiffs assert, by the fact that the high support prices forced many manufacturers to switch from sugar to other sweeteners such as corn sweeteners in their products, and by the fact that the lower quota levels induced even greater imports of high-sugar-content articles (to circumvent the quota on raw sugar) which repeated the above process, further exacerbating the problem. Plaintiffs' Memorandum at 11–17.

Related to this mode of analysis, plaintiffs contend that "[a]ll imports of high sugar content articles should be considered like or directly competitive articles [with those produced by plaintiffs] ... because the increase in the importation of these articles is due solely to the substantial advantage of the imported refined sugar created by U.S. government regulation." *Id.* at 24. That is,

> the increase in sugar imported in *all* high sugar content articles, including that in mixtures of sugar and one or more other ingredients such as tea, flavoring and gelatin should be considered directly competitive products because there is substantial evidence that the sole reason for the increase in these imports was the inducement to obtain access to the substantially lower cost refined sugar in these mixtures.

*Id.* (emphasis added). In response to the Government's position that because of their different uses, many of these imported high sugar content items are not like or directly competitive with the refined sugar products formerly produced by the Bunker Hill refinery, plaintiffs state that in the case cited by the Government in relying on *use* as the determining factor, there was no

---

**1.** The first consideration seems essentially irrelevant, and the second seems to *commend,* not devalue, the report as relevant to the issues in this action.

evidence that government regulatory policy caused the domestic item to be "far more costly" than the imported item. *Id.*

## ANALYSIS

It is necessary in deciding between these contending positions first to examine the statute at issue establishing the eligibility criteria for worker adjustment assistance. Section 2272 of Title 19 U.S.C. enumerates the requirements for "group eligibility" for worker adjustment assistance benefits, directing Labor to certify a group of workers as eligible to apply for such assistance if Labor determines

(1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

The dispute in this action concerns only the third requirement. Further distilled, this requirement establishes two criteria: first, the imported articles involved must be "like or directly competitive with" those produced by plaintiffs' firm, i.e., with refined sugar; second, those imports must have "contributed importantly" to the plaintiffs' separation from employment. Both elements must be established to meet the third requirement.

In a survey of the customers of the Bunker Hill refinery conducted during its original investigation, Labor "found that the increased purchases of imported refined sugar were unimportant during the period reviewed." Opposition at 18. The principal issue raised by plaintiffs to be considered on remand was whether imports of sugar blends and substitutes met this requirement. In its remand investigation Labor determined that "no customers had imported sugar substitutes, although a few customers had imported blended sugar...." *Id;* with regard to the latter, Labor determined that "blended sugar such 'Pure Sweet,' which was purchased by some of Bunker Hill's grocery customers, is substitutable for refined sugar as a sweetener and is competitive in price with refined sugar." *Id.* at 15. However, from a further survey of Bunker Hill customers, Labor concluded that "[t]he few customers who imported blended sugar had import purchases that were not important in the relevant time period surveyed. None of Bunker Hill's manufacturing customers imported blended sugar, only the grocery customers did." *Id.* Based on these findings, Labor determined that the imports of sugar blends that did occur were not sufficient to have contributed importantly to plaintiffs' separation.

Plaintiffs apparently do not contest those empirical findings [2], and the Court discerns no reason to suspect their accuracy, nor, therefore, to conclude that part of Labor's determination based thereon is unsupported by "substantial evidence". *See* 19 U.S.C. § 2322(b). Instead, plaintiffs state that, because of the characteristics of the sugar market noted above, "the results of customer surveys are of no significance in this matter"; Memorandum at 15; plaintiffs principally contend that Labor erred on remand in that it unduly restricted the scope of the imported products investigated and "did not consider the effect of imports of various sugar-containing substances throughout the United States on the sugar import quota and the consequences of the reduction of the sugar import quota on the ability of Amstar Sugar Corporation to provide adequate supplies of raw cane sugar to the Bunker Hill Refinery to permit it to operate." Memorandum at 3. Essentially, plaintiffs' position is that Labor did not pursue the effects of imports far enough: that after determining that those imports mentioned did not affect Bunker Hill directly by supplying customers who otherwise

---

**2.** Plaintiffs did not respond to the defendant's    opposition memorandum.

would have purchased from that refinery, Labor should have proceeded further to consider the effects on Bunker Hill that the imports of those and other imported sugar-containing products might have had when communicated through, magnified, or exacerbated by the U.S. government sugar import quota system, particularly in raising the price and lowering the availability of raw sugar required by Bunker Hill and in shifting demand from refined sugar to alternative products.

It is true that particular imports can "contribute importantly" to the separation of employees from a company in other ways than by directly diverting purchases by the customers that otherwise would have been placed with the company. As stated above, however, it must also be established that those products are "like or directly competitive with" the merchandise produced by the separated employees. This criterion relates not so much to the effect of the imported product but to its nature, characteristics, and uses. In this regard, plaintiffs argue that all imports of articles containing high proportions of sugar must be considered like or directly competitive with the refined sugar produced by Amstar because the increased imports of all such products is "solely" due to price advantage enjoyed by imported refined sugar (i.e., the advantage that foreign manufacturers of such products enjoy by reason of their access to raw sugar that is substantially cheaper than the domestic sugar Amstar was forced to buy at prices inflated by the U.S. quota program substantially over the world price). Memorandum at 24, et seq. Labor rejected that argument, and the Court can not conclude that it was wrong in doing so.

The artificially inflated price of domestic sugar well may shift consumer purchasing patterns, but that fact does not establish that all articles containing sugar are like or directly competitive with refined sugar. An increase in the price of one item might shift consumer purchases to others, away from that item and even from other products in which that item is an ingredient. For instance, if a substantial increase in the price of gasoline resulted in an in-creased level of bicycle imports and decreased purchases of domestic automobiles, surely that consequence would not establish that bicycles are a product like or directly competitive with automobiles. That, given the change in the price of gas, a necessary "ingredient" for operating an automobile, consumers choose to change their living habits to commute more by bicycle is simply a manifestation of the basic microeconomic principle that changes in supply (from changes in cost or otherwise) cause shifts in demand patterns; this does not necessarily mean that the products *to* which demand shifts are directly competitive with those *from* which shifts. Such *would* be the case if, for example, an increase in the price of a certain input unique to *American* autos raised their prices relative to, and thus caused increased imports of, foreign *autos;* in that case, though, it is the fact that both the domestic and the imported items are autos that make them directly competitive, not the shift in demand alone. In the jargon of "the dismal science", the elasticity of demand for more than one product relative to the cost of a certain input does not establish those products as directly competitive with each other in essence.

In the present case, for example, several of the products identified by the Report as having been imported in increased quantities as a result of the differential in U.S. and world sugar prices are bulk sweetened chocolate bars, and edible preparations of gelatin, currant strawberry and pineapple jelly, and candied cherries. Opposition at 28. The increase in those imports could very well have been caused by the fact that the foreign-source sugar included in their ingredients was less expensive than American sugar; and that increase could also decrease in various ways the domestic and foreign demand for the refined sugar produced by Amstar. It does not, however, mean that those products are either like or directly competitive with refined sugar. Nor, as another example, are the iced tea mixes imports of which were also found by the report to have increased.

Congress chose to make adjustment assistance available not to all persons or industries displaced by "imports", nor even to just those displaced by "competitive" imports, but instead to those displaced by "*directly* competitive" imports. It is not enough, then, that the imports compete with or affect the plaintiffs' product indirectly or circuitously. Most of the imported products identified by plaintiffs and the Report are products which contain raw or refined sugar as an *ingredient.* Of previous judicial decisions on this subject in cases concerning ingredients and finished products, this Court has stated,

> Under this line of cases, the test is clear: the imported article, which allegedly injured the domestic market, "must be found to be 'interchangeable with or substitutable for' the article under investigation." *Holloway [v. Donovan,* 7 CIT 237] at [240], 585 F.Supp. [1427] at 1430 [ (1984) ] (quoting *Machine Printers and Engravers Ass'n [v. Marshall],* 595 F.2d [860] at 862 [(D.C.Cir.1979) ] ). Based on this test, a component ... cannot be like or directly competitive with the finished product. [*United Shoe Workers v.] Bedell, supra* [506 F.2d 174] at 177–78 [ (D.C.Cir.1974) ].

*International Union, United Auto, Aerospace and Agricultural Implement Workers of America, UAW Local 834 v. Donovan,* 8 CIT 13, 20, 592 F.Supp. 673, 678 (1984); *see also United Mine Workers of America v. Brock,* 11 CIT 414, 664 F.Supp. 543 (1987). Plaintiffs object that the cases relied upon by Labor on this point did not involve government programs which caused the increases in imports. The Court discerns nothing in the statute or otherwise that makes that distinction material to the present controversy.

What *is* like and directly competitive with plaintiffs' product is imported refined sugar, and possibly *some* sugar substitutes or blends. But Labor's investigation showed that the increase in imports of refined sugar in the relevant period was minimal, as was the level of imports of blended sugar by customers of the Bunker Hill plant; and that no customers surveyed reported increased purchases of sugar substitutes. As stated earlier, the Court is aware of nothing to cast doubt on these findings. Also, for the reasons given, the Court deems sound Labor's determination that other items than these involved in the Report can not be found to be like or directly competitive with refined sugar. Therefore, the Court finds no basis to displace the presumption of correctness resting with Labor's determination.

This is not to deny the possibility of perverse and substantially harmful consequences of the U.S. system of sugar import quotas, for plaintiffs and for other domestic companies as well. The present action, however, was brought under the trade adjustment assistance legislation and must be decided in accordance with the requirements established therein; for any consequences of the quota system not falling within those strictures, harmful though those consequences may be, redress must be sought from the architects of that system—Congress.

## CONCLUSION

For the foregoing reasons, the Court concludes that the determinations by the Department of Labor on remand are supported by substantial evidence on the record. Accordingly, plaintiffs' motion is denied and this action is dismissed.