UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, LOCAL 610, MICHAEL MURPHY, JAMES CAPPETTA, AND EDWARD KRISTOFIK, PLAINTIFFS *v.* LYNN MARTIN, SECRETARY OF LABOR, U.S. DEPARTMENT OF LABOR, DEFENDANT

Court No. 86-11-01409

(Decided June 27, 1991)

*United Elec., Radio and Mach. Workers of America, (Robin Alexander), Neighborhood Legal Services Ass'n, (John Stember), National Employment Law Project, (Richard Goldberg)* for the plaintiffs.

*Stuart M. Gerson,* Assistant Attorney General, *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, *(Velta A. Melnbrencis), Gary Bernstecker,* U.S. Department of Labor, of counsel, for the defendant.

MEMORANDUM AND ORDER

RESTANI, *Judge:* Defendant has now submitted its fifth determination.[1] Plaintiffs, former employees of the Swissvale, Pennsylvania plant of Union Switch and Signal ("Company" or "Union Switch"), a company producing railway systems, claim that they lost their jobs because the Company substituted foreign imports for products formerly produced at Swissvale.[2] Initially, the Department of Labor ("Labor" or "Secretary") denied certification of any Swissvale workers. On redetermination Labor, after finding that it had conducted an inadequate investigation, certified three sections of the plant, comprising section 110 (sheet metal fabrication), section 390 (dipping of sheet metal to prevent rusting), and section 222 (part of Unit Shop II which wired office control panels). This included sixty (60) of about five hundred (500) workers.

Petitioners objected to the determination, pointing out that the Company had continually supplied false and misleading information to Labor, and that the imported Canadian panels adversely affected employment throughout the plant. Moreover, plaintiffs claimed that other imports, such as Korean relay frames and Italian train-stop kits, caused layoffs.

This investigation has been remanded previously due to admitted investigative inadequacies by Labor and other failures on the part of the Secretary found by the court. In *United Electrical II,* the court, finding that the congressional intent that workers laid-off due to imports receive benefits promptly had been frustrated, took the extraordinary step of insisting that, if Labor continued to deny certification to the entire plant, it locate specific documentary evidence refuting petitioners' claims or, if such evidence could no longer be obtained, then it must produce any Company official on whose testimony it relies to refute plaintiffs' claims at a hearing.

Labor obtained sworn statements from three Company officials which, it contended, supported its negative determination. Unable to locate a significant amount of documentary evidence, Labor conducted a hearing on May 23, 1990. Labor did not allow petitioners to present their own witnesses at the hearing. The court granted plaintiffs' request that Labor consider post-hearing statements by former Company employees and management personnel. Labor reaffirmed its negative determination.

In *United Electrical III,* the court found that the statements submitted by petitioners supported their claim for certification, and that those relied upon by Labor either supported certification, were irrelevant, or incompetent. The court found that Labor, for unacceptable reasons, had given no weight to the statements submitted by petitioners. The court

---

[1] For a more detailed history of this case, *see United Elec., Radio & Mach. Workers of Am. v. United States,* 11 CIT 590, 669 F. Supp. 467 (1987) (*United Electrical I*), *United Elec., Radio & Mach. Workers of Am. v. Brock,* 14 CIT 121, 731 F. Supp. 1082 (1990) (*United Electrical II*) and *United Elec., Radio & Mach. Workers of Am. v. Dole,* 14 CIT 818, Slip Op. 90–131 (December 13, 1990) (*United Electrical III*).

[2] Following a bitter strike, separations began in 1983 and continued until the plant shut down in 1987.

ordered plaintiffs to submit *sworn* statements. If they continued to support certification of the Quality Assurance section ("QA") of the plant, then Labor was to certify that section. Labor was then to decide what other sections of the plant were to be certified due to imports of Canadian office control panels. The court stated that "[i]f distinctions cannot be drawn because of loss of records and witnesses cannot remember exact times of layoffs in various sections, the entire plant must be certified because Labor is responsible for the delays and loss of records." *United Electrical III,* Slip Op. at 25–26.

If the whole plant could not be certified due to imported panels, Labor was to examine the effect of imported train-stop kits. The court instructed Labor to determine "if increased imports of competing train-stops to the American market in general, as well as to Union Switch, contributed importantly to employment declines at Swissvale." *Id.* at 26.

Plaintiffs submitted sworn affidavits from Messrs. Bruce Wilson, James Fonzi and John Fabrizzi, reiterating their statements submitted prior to the last determination.

## I. *Office Control Panels:*

In its determination of January 13, 1991, Labor states that importation of Canadian office control panels could not form a basis for certification beyond the three sections of the plant already certified. The Secretary pointed out that the record indicates that employment in QA dropped in 1984, remained relatively flat in 1985, during the period of investigation ("POI"), and dropped again in 1986. Labor relates these figures to the statements of petitioner's affiants, which indicate that the imported panels originally arrived at Swissvale in relatively unfinished condition and required much work and added value. By the beginning of 1985, however, they came in relatively complete condition, with little or no work left to be done. This, the Secretary claims, indicates that by 1985, imported panels had no effect on employment in QA.[3] Supplemental Administrative Record II ("Supp. Ad. R. II") at 18.[4] This is an enormous leap of logic. Furthermore, the court cannot help but notice that Labor seems to have taken a 180 degree turn in its reasoning for why panel imports cannot form a basis for further certification. In his July 13, 1988 memorandum to the certifying officer, the director of Labor's Office of Trade Adjustment Assistance stated that "[t]he certification of panel imports was limited to the three departments because of the positive employment effect of panel imports on other departments." C–189.[5] The director seemed to be of the same opinion after the third remand investigation, Supp. Ad. R. I at 62, and the certifying officer gave as a reason for his negative determination that "I am persuaded that signifi-

---

[3] Or anywhere else in the plant, for that matter, notwithstanding the three certified sections.

[4] "Supp. Ad. R. II" refers to the administrative record compiled on the fourth remand investigation.

[5] The prefix "C-" refers to the administrative record compiled during the second remand investigation.

cant additional work had to be performed on the imported panels." *Id.* at 68. Now, faced with the court's order that it consider the affidavits submitted by petitioners which claim that the panels came in finished condition, Labor claims that they do not form a basis for certification *because* they came in finished. This "heads I win tails you lose" reasoning is unacceptable.[6]

As for the figures regarding employment in QA, the court believes that it is simply too late to use this as a basis for refusing to certify. First, these records are of dubious accuracy. Mr. Daniel Edwards, who served as plant manager at Swissvale just following the POI, said that, while he served in this position, "employees were transferred all around the plant. Because much of the clerical staff was laid off, Union Switch did not prepare normal transfer paperwork." C–123.[7] Labor attempts to support its conclusions by pointing to employment records collected during the initial investigation which indicate that after an initial drop in employment in 1984, employment rose slightly in 1985 before dropping again in 1986 followed by the plant shutdown in 1987. Initial Administrative Record at 44–46. Labor argues that this shows that "the entire plant did not meet criterion (3) of 19 U.S.C. § 2272(a)." [8] Defendant's Brief ("D. Brief") at 55. This, however, is not an attack on criterion (3), but rather on criterion (1). Labor has never disputed that petitioners have met criteria (1) and (2). *United Electrical II,* 731 F. Supp. at 1084. Finally, the court has already noted that, against the background of this particular case,"[t]he fact that layoffs were recorded in QA in May 1986 supports the conclusion that they were threatened earlier." *United Electrical III,* Slip Op. at 25 n.16.

In any event, plaintiffs' affiants gave sworn testimony that, *by the beginning of 1986,* panel imports had "eliminated well over 20% of the jobs throughout the plant." Supp. Ad. R. II at 2, 4. Defendant argues that these employees, which comprised an inspector of QA and the manager of QA, never explained how they were "in a position to know how many jobs were eliminated throughout the plant as a result of panel imports." D. Brief at 46, 47. After the third remand investigation, however, the certifying officer based his negative determination on, *inter alia,* the fact that "Mr. [V. John] Poremba testified that there were no worker

---

[6] Along these lines, the court notes that Labor's present position seems to be that plaintiffs filed their petition at the worst possible time, too late to cover any layoffs due to panel imports, Supp. Ad. R. II at 17–18, and too early to cover any layoffs due to imported Korean relay frames. *United Electrical II,* 731 F. Supp. at 1087–89.

[7] The court notes that in *In re Robert H. Keeler,* No. TRA–87–6–0–1669 (Nov. 4, 1987), the Pennsylvania Unemployment Compensation Board of Review found that, during the POI, "[b]ecause of the constant turnover and reassignments, and because of the knowledge that the layoffs would continue through the date of the plant shutdown, transfer papers were not made out and the payroll records were not changed."

[8] According to section 222 of the 1974 Trade Act, in order to certify a group as eligible for adjustment assistance, the Secretary must determine:

    (1)   that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm has become totally or partially separated, or are threatened to become totally or partially separated,

    (2)   that sales or production, or both, of such firm or subdivision have decreased absolutely, and

    (3)   that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

19 U.S.C. § 2272(a) (1988).

separations because of the imported Canadian panels. * * *"[9] Supp. Ad. R. I at 68. This despite the fact that he was no longer actively employed at Union Switch during the last half of the POI. *Id.* at 59. Plaintiff's affiant Mr. Bruce Wilson, the former inspector of QA and a Company employee for over 35 years who worked at Swissvale throughout the POI, displayed a thorough knowledge of how panel production affected sections throughout the plant at the original hearing held on April 16, 1987. Transcript at 35–36.

Labor also determined that panel imports could not form the basis for further certification because the purchase orders in the administrative record indicate that the dollar value of panel purchases by the Company declined during the POI, Supp. Ad. R. II at 18, and that therefore criterion (3), which requires that separations be caused by *increases* in imports, was not met. Throughout this litigation, petitioners have claimed that, after it was shown that the Company's claims that it was not importing were shown to be false, that it underreported its foreign purchases. Plaintiffs claim that

> [t]he company had at least three objective reasons to understate any reliance on imports: (a) Federal law imposed criminal and/or financial penalties if railway equipment sold to publicly funded mass transit systems, [Union Switch's] major customers, was not fully assembled in the US and comprised of at least 50% domestic content; (2) [Union Switch's] marketing strategy depended heavily on the high quality reputation associated with the "made in Swissvale" logo, which the company continued to affix on imported panels and other parts; and (3) the company was embittered towards the Union, Petitioners herein, as a result of a difficult strike.

Plaintiffs' Objections to Defendant's Decision ("P. Brief") at 16.

There is support for petitioners' allegations in the record. According to Mr. Edwards,

> [t]here are a number of reasons why Union Switch would have wanted to down-play and understate its use of imports. For many years the New York City subway system was Union Switch's biggest customer. An order from New York could account for as much as two months of the plant's yearly workload. In the years preceding shutdown, the United Electrical Workers Local 610, the union which represented hourly employees at Swissvale, mounted a campaign to try to stop outsourcing and job loss. Local 610 officials went to New York City and joined with other unions and claimed that Union Switch was outsourcing parts and that these imports were of inferior quality and created possible safety hazards. The campaign caused Union Switch some problems and increased animosity between the company and the union. The company received complaints and enquiries from the New York City subway system. Thus to maintain its image, keep its market share and placate its largest

---

[9] In fact, Mr. Poremba never made such a categorical statement. *See* Transcript of the May, 23, 1990 hearing ("H–") at 65. Moreover, he emphatically vouched for the *integrity of plaintiffs' affiants, including the inspector of QA.* H–98–99.

customer—who thought it was buying Swissvale made products—
Union Switch had a good reason to understate or disclaim substan-
tial reliance on imported parts.

C–122. The fact that the Company has been so unforthcoming about its
import practices throughout this investigation, a fact that led the court
to order extraordinary procedures in *United Electrical III,* leads the
court to give credence to petitioners' allegations.[10] At this point, there-
fore, the court cannot view as reliable the data gleaned from the pur-
chase orders in the record. Even if they are accurate, however, the
Secretary concluded the overall market for railway systems was in de-
cline. *See supra,* n.10. Therefore, a decline in the absolute dollar of for-
eign purchases does not indicate that there was not a *relative* increase.
*Id.*

The most troubling aspect of the latest determination on remand re-
garding imported panels is that Labor has introduced a new, and not
well explained, theory for its negative determination. The certifying of-
ficer contends that

> [t]he Swissvale plant produced signalling systems and components
> of those systems. With respect to components, the courts, early in
> the administration of the worker adjustment assistance program,
> addressed the issue of components and finished articles. In *United
> Shoe Workers of America, AFL–CIO v. Bedell,* 506 F.2d 174, (D.C.
> Cir. 1974), the court held that imported finished women's shoes
> were not like or directly competitive with shoe components. * * *
>
> Accordingly, the panels imported from Canada are not like or di-
> rectly competitive with the signalling systems of which they are a
> component.

Supp. Ad. R. II at 19. Presumably, then, criterion (3) would not be satis-
fied. *United Shoe,* however, is inapposite. That case dealt with domestic
producers of components who claimed to have been injured by the im-
portation into the U.S. market of a finished product by an unrelated im-
porter. The court found that it was reasonable for Labor to determine
that domestic component producers could not claim the right to trade
adjustment assistance due to competition from imported finished prod-
ucts because, if the two products were like or directly competitive, then
"manufacturers of nuts and bolts * * * [could] claim * * * relief on ac-
count of the importation of automobiles." *United Shoe,* 506 F.2d at 181
(*quoting* 101 Cong. Rec. 8162 (1955)).

The rationale of that case does not apply to the investigation at bar,
however. This is not a case of producers of panels complaining about im-
portation into the U.S. market of fully finished train systems. Rather,

---

[10] The court cannot accept the Secretary's conclusion that the Company was unaware of its own import practices. The apparent fact that imports led to disaffection among both its workers and its customers renders such ignorance incred-ible. The court also notes that, according to Labor's own regulations, "'[i]ncreased imports' means that imports have increased either absolutely or *relative to domestic production* compared to a representative base period * * *" 29 C.F.R. § 90.3 (emphasis added). Because the Secretary certified three sections of the plant due to panel imports, Labor must have determined either that the Company continued to supply false data regarding panel imports, or that, due to difficult market conditions, Supp. Ad. R. II at 18, domestic production had declined to the point that panel imports had increased relatively despite an absolute decrease. In any case, it cannot be that panel imports had increased for some sections of the plant but not for others.

these are producers of fully finished systems, as well as the components therein, complaining of importation of components of those systems to their own plant. The workers produced exactly what was imported. This is not a situation where "the allegedly competing item has been processed into an entirely new article." *Id.*

*United Shoe's* progeny, cited by defendant in its brief, likewise do not support the Secretary's determination. In *Morristown Magnavox Former Emp. v. Marshall,* 671 F.2d 194 (6th Cir.), *cert. denied,* 459 U.S. 1041 (1982), Labor had determined that workers who produced television components at a plant which had shut down did not lose their jobs due to competition from imports of fully assembled Japanese television sets. The court based its affirmance on the Secretary's finding that fully assembled televisions were not "like or directly competitive" with the printed circuit boards, fly backs and deflection yokes produced by petitioners.[11] *See also Int'l Brotherhood of Elec. Workers v. Donovan,* 10 CIT 524, 642 F. Supp. 1183 (1986)(imported Japanese televisions were not like or directly competitive with picture tubes produced by petitioners). In the *Morristown* investigation, however, the Secretary apparently based his rationale on the fact that the company *"did not increase its reliance on imports of the components which had been produced by the petitioning workers."* 671 F.2d at 196 (*quoting* the Secretary's Brief at 15) (emphasis added by the *Morristown* court). In the investigation at bar, this is *exactly* what happened.

The court followed this line of reasoning in *Holloway v. Donovan,* 7 CIT 237, 585 F. Supp. 1427 (1984). In that case, the court upheld the Secretary's determination that imported automobiles were not like or directly competitive with the automotive parts produced by petitioners because "the components in question, automotive injection molded parts, are not interchangeable with or substitutable for the end product, a fully assembled automobile." *Id.* at 240–41, 585 F. Supp. at 1431. The court engaged in this analysis, however, only after it had already noted that "[t]he investigation revealed no shift in production between [petitioners'] plant and other domestic or foreign plants. * * *" *Id.* at 238, 585 F. Supp. at 1429. Similarly, in *International Union v. Donovan,* 8 CIT 13, 592 F. Supp. 673 (1984), the court upheld the Secretary's determination that fully assembled automobiles imported into the U.S. market were not like or directly competitive with the automotive parts produced by petitioners. *Id.* at 20, 592 F. Supp. at 679. The court used a different analysis, however, in determining whether to uphold the Secretary's negative determination regarding production of parts which the company itself had transferred overseas. The court upheld the Secretary's determination, not because such parts were not "like or directly competitive" with petitioners' product, but because such imports were *de*

---

[11] In *Morristown,* the Secretary also based his determination on a finding that the company's sales had in fact *increased* during the POI. The opposite is true in the investigation at bar.

*minimis. Id.* at 18–19, 592 F. Supp. at 678. To reiterate, panel workers in the investigation at bar are not claiming to have been displaced by imports of fully assembled railway systems into the U.S. market. Rather, they claim that the Company transferred production, formerly performed by petitioners, to foreign producers. Therefore, Labor clearly misanalyzed the data.

The Secretary also cites *Mach. Printers and Engravers Ass'n of the United States v. Marshall,* 595 F.2d 860 (D.C. Cir. 1979)(per curiam). In that case, the court upheld Labor's denial of Trade Adjustment Assistance to workers who engraved patterns on metal or plastic rollers for use in printing patterns on fabrics. The workers claimed that they had lost their jobs due to imported fabric. This case is clearly inapposite. Not only is imported fabric not "like or directly competitive" with engravings, but engravings cannot even be said to be a "component" of fabric.

After citing *United Shoe,* the certifying officer states that "[i]t is the Department's policy to certify component workers if at least 25 percent of the activity of their department or their work is related to the production of the article adversely affected by the imported like or directly competitive article." Supp. Ad. R. II at 19–20. This simply does not make sense. The certifying officer had just finished stating that the imported panels were *not* "like or directly competitive" to Swissvale' product. Perhaps he meant that if 25 per cent of a component supplier's activity is eliminated or threatened with elimination by the importation of a finished product, then Labor *does* view the domestic and foreign articles as "like or directly competitive." As explained *supra,* however, such is not the situation at bar.

Even if such an analysis were applicable to the investigation at bar, however, none of the previous determinations mentioned application of this standard. Nevertheless, Labor now states that it applied the 25 percent test in this investigation, and that the three certified sections passed. The other sections, presumably, did not. Supp. Ad. R. II at 19–20. Defendant argues that the record demonstrates that Labor made these calculations during the first remand investigation. D. Brief at 60. The part of the record cited, A–33–34,[12] does show certain calculations, but for only two of the three certified sections. More importantly, Labor clearly made these calculations using the wrong panel data, i.e., with a process sheet for a small B–30 panel instead of a much larger and more expensive office control panel. *See United Electrical II,* 731 F. Supp. at 1085. Most importantly, however, it is simply too late for Labor to explain its negative determination by means of some never before mentioned theory. Moreover, since, as explained *supra,* this is not the *United*

---

[12]The prefix "A–" refers to the administrative record compiled by Labor during the first remand investigation.

*Shoe* situation, the 25 percent test is contrary to law because it appears that Congress

> intended that in most cases total or partial separation of a significant number or proportion of the workers should be found where the total or partial separation, or both, in a firm, or an appropriate subdivision thereof, is the equivalent to a total unemployment of 5 percent of the workers or 50 workers, whichever is less.

Report of the Senate Committee on Finance on the Trade Reform Act of 1974, S. Rep. No. 1298, 93rd Cong., 2d Sess. 133, *reprinted in* 1974 U.S. Code Cong. & Admin. News 7186, 7275.

Since the three certified sections of the plant passed Labor's overly restrictive test notwithstanding the fact that the Secretary used time sheets for a much smaller panel than those the production of which had been moved abroad, there can be little doubt that Labor's decision to certify these sections was proper, even if arrived at erroneously. If, indeed, Labor made these calculations for other sections of the plant, they, too, might have passed the test had the Secretary used time sheets for an office control panel and had required an outcome of only 5 percent.

Throughout this litigation, petitioners have maintained that panel imports affected every section of the plant. Labor has disputed this but has not supported that conclusion properly. As the appropriate time sheets are no longer available, the truth will never be known, but petitioners must not be made to suffer because of the Secretary's investigative errors. In conclusion, the court is not merely reweighing the evidence relied on by the Secretary. The court finds that the Secretary's findings are not supported and can never be supported by substantial evidence.

## II. *Train-Stop Kits:*

Labor has ignored the court's instructions that it "determine if increased imports of competing train-stops to the American market in general, as well as to Union Switch, contributed importantly to employment declines at Swissvale." *United Electrical III,* Slip Op. at 26. Instead, it has adhered to its reasoning that the Italian train-stop was not like or directly competitive with the Company's product because

> [t]he train stop system produced at Swissvale could not be used to replace an imported train stop system that developed defects as the result of the normal wear and tear involved in operating the system. Similarly, the imported train stop system could not be used as replacements for systems components used in systems produced at Swissvale.

Supp. Ad. R. II at 22–23.

Even if accurate, this only demonstrates that the Italian system was not "like" the domestic product, not that it did not directly compete with Swissvale's product. As the court pointed out,

> [p]erfect substitutability under contract specifications is not necessary to a finding that products compete or that increased imports of

> such competing goods caused or threatened layoffs. If users specified a competing type of imported train-stop rather than a domestic type, thus significantly contributing to employment declines at Swissvale, certification should have occurred.

*United Electrical III,* Slip Op. at 17. Moreover, as plaintiffs point out, "Labor has issued numerous certifications for American autoworkers despite the fact that Toyota, Nissan and Honda windshields, transmissions and other parts are not interchangeable with parts for GM, Chrysler or Ford vehicles." P. Brief at 22 n.17.

Defendant now argues that the Italian system is newer and more technologically advanced and that to view the two systems as directly competitive "would render (1) a manual typewriter 'like or directly competitive with' an electronic typewriter with a text memory because both are allegedly substantially equivalent for commercial purposes and adapted to the same uses, *i.e.,* typing, and (2) a Cadillac automobile 'like or directly competitive with' an inexpensive imported sub-compact because both are adapted to the same use, *i.e.,* driving." D. Brief at 67–68. The record, however, indicates that the Italian system was in fact not newer, not more sophisticated, and did not even require different facilities or engineering expertise to produce. H–12–15.

III. *The Secretary Must Certify the Entire Plant:*

As the court previously noted,

> [a]t this point in time, it is highly unlikely that a true picture of the impact of imports on employment at Swissvale will ever be known. It may be that more workers will be certified as eligible than should have been if the proper documentary evidence was obtained and the proper avenue of investigation followed at the outset. But plaintiffs may not be penalized because of Labor's initial errors and easy grasp of erroneous data indicating lack of eligibility.

*United Electrical III,* Slip Op. at 26–27.

The court believes that the only just action to take now is to certify the entire plant. This will likely involve more workers than would have been certified had Labor followed proper procedures initially, but it is much too late for any further remands to produce any more accurate results. Due to the Secretary's repeated failure to conduct an adequate investigation, the documentation which would have resolved the pending questions is no longer available, and memories are stale. Petitioners must not be penalized for this. Recognizing this, in *United Electrical III,* the court ordered the Secretary to certify the plant if petitioners submitted sworn affidavits which continued to support certification. Petitioners did so, but Labor failed to carry out the court's instructions.

The court has the power to order the Secretary to certify the entire plant, and does so. 19 U.S.C. § 2395(c) (1988). *See also United Electrical III,* Slip Op. at 24 n.14.

Conclusions

Throughout this investigation, Labor has relied on false data and has used protean reasoning to force its negative determination to fit what-

ever new facts come to light. No purpose would be served by yet another remand. Questions regarding this investigation will always remain. Nevertheless, "[a]ll things must end — even litigation." *Southern Rambler Sales. Inc. v. American Motors Corp.*, 375 F.2d 932, 938 (5th Cir.), *cert. denied,* 389 U.S. 832 (1967). The Secretary shall certify the entire plant as eligible for Trade Adjustment Assistance.